OLIVER HANCHETT, OLIVER PARSONS AND SIMEON
SPENCER, AGENTS OF THE SECOND ECCLESIASTICAL
SOCIETY IN SUFFIELD, *against* DAN KING.

The legislature having, in 1670, made a grant of a township to certain proprietors, they soon afterwards set apart a portion of it for *the use of the ministry, to continue and be improved for that use for ever:* In 1740, a new and distinct ecclesiastical society was formed within the limits of the town. In 1797 the two societies agreed to make partition of the lands thus set apart, when the first society released to the second, for the use of the ministry, their right to a certain portion. It was held, that before the formation of the society in 1740, the town, in their ecclesiastical capacity, became vested with the lands in question, for the use expressed in the sequestration; that upon that event, the remaining inhabitants became in fact, and in name, the first society, and, as such, were instantly vested with all the rights which the town, in its ecclesiastical capacity, before had; that the subsequent conveyance from the first to the second society, being a fair and equitable compliance with the intent of the grantors, was valid; and, consequently, that the second society were entitled to recover in ejectment against a tenant claiming under a lease from the town executed in 1794.

The town by leasing the sequestered lands, and receiving the rents and applying them to the use of the ministry from the time of sequestration until 1794, gained no title by possession; the possession being in trust, and pursuant to the sequestration, and, therefore, not adverse.

MOTION for a new trial.

This was an action of ejectment for a piece of land in the town of *Suffield*, called the *Ministry Meadow*.

The defendant pleaded the general issue; and on the trial the facts were as follows: In 1670, a grant of the township of *Suffield* was made to certain proprietors, who, in 1671, appointed a committee to lay out lots and superintend the proprietors' interest in the township. The committee proceeded to locate the shares, and divided the same into lots of eighty acres each, and directed that in the ultimate division of said town, a certain proportion of meadow land should be annexed to each lot or share. Among other acts, the committee ordered that eighty acres of land should be set apart for the use of the ministry, " to continue and be improved for that use for ever, and not granted away, or sold, or in any way alienated therefrom; the true intent of this order and grant is the continuance of this allotment for the ministry, or use of the church of God in this place for ever." It was also declared, " that every grant or alienation contrary to this stating and settling of it for the ministry,

nistry should be void." In pursuance of this order, two lots, one of sixty and another of twenty acres, were laid out. Afterwards, in 1716, the selectmen of *Suffield* laid out for the same use eight acres of meadow-land, being the proportion which, by order of the committee, was to be annexed to a share of eighty acres; which has ever since been called and known by the name of the *Minis-try Meadow*. In 1740, the second ecclesiastical society in *Suffield* was regularly constituted and established; but in their act of incorporation no notice is taken of the lands sequestered for the support of the ministry. During the whole time before their incorporation, and after, until 1794, the inhabitants of *Suffield*, at their town meetings, appropriated the avails of said land to support the gospel ministry. In 1790, the town appointed a committee to examine the condition of the land, and devise means to render it more productive; who reported, that the land ought to be sold or leased, and the proceeds applied to the objects designated in the sequestration. The town accepted the report, and in 1792 empowered a committee to lease the land; in pursuance of which, in 1794, they leased the *Ministry Meadow* to the defendant for 999 years, reserving an annual rent. The defendant reconveyed the land by a deed conditioned to be void in case he annually paid the rent, and performed certain covenants contained in the leases. Until 1804 the rent was duly paid; since which time payment has been discontinued.

In 1797 the two societies agreed to make partition of said lands; when the first society released to the second their right to the *Ministry Meadow*, restricting the application of the rents and profits to the support of the gospel ministry.

Upon these facts the court charged the jury that the town of *Suffield* became vested with the lands in question for the uses expressed in the sequestration; that when the second society was incorporated, the first became vested with said lands for the same uses; that the

conveyance from the first to the second society, being a fair and equitable compliance with the intent of the grantors, was valid; that the possession of the town being in trust, and pursuant to the intent of the sequestration, was not adverse, and no title was thereby gained; that, therefore, the plaintiffs were entitled to recover.

The jury brought in a verdict accordingly; upon which the defendant moved for a new trial. The court granted a rule to show cause why a new trial should not be granted, and reserved the question for the consideration of the nine judges.

*Ingersoll* and *H. Huntington*, in support of the motion. The fee of this property, by the original sequestration, vested in the town. The town stood in the place of a trustee to receive and pay over the rents and profits to the support of the ministry. Sequestrations of this description have been held valid. The fee of the land must vest somewhere, and it could only be in the town.

If the intent of the donors be taken as a guide, the result will be the same. The provision was evidently intended for the support of the ministry generally, not for a particular society. The object was to promote the preaching of the word of God; and this court will not say that baptists and methodists do not preach the word of God. But if the court recognise the right of the first society to convey, it will operate an exclusion of all other societies and denominations from the benefit of the grant. A compliance, therefore, with the intent of the grantors required that the property should remain in the town, without which that intent could not be carried into effect.

It is said that while the town had property in the land, it was in their *ecclesiastical* capacity. As well might it be said of a fund given for the support of highways, that the town took it in their *road* capacity. The limit-

ation in the grant applies to the use, not to the character or capacity of the trustee.

If, however, we admit that the title to this land vested in the first society, upon the incorporation of a second, it is not perceived how the second society can recover. Let it be remembered that this construction rests solely on the supposed intent of the grantors; and that the intent must be pursued. But if that intent be so imperative as to exclude the second society from a participation in the grant, by what authority can the first society transfer the lands, and thus defeat the very intent on which their title is predicated. And though the law may have said that the first society had title to the exclusion of the second, yet we ask the authority by which the first society has become the interpreter of the grantors' intention, with power to convey to the second, and thus exclude any other society which is or may be formed from the benefit of the grant? Yet this is the direct consequence of establishing the conveyance made by the first society.

Further, the town, when only one ecclesiastical society existed, had the same right which the first society had after the incorporation of the second. If the first society was a mere trustee, the attempt to convey the legal and beneficial interest to the second society is futile, and the conveyance void.

But if they take the ground that the first society had the beneficial as well as legal estate, we claim that the town has title by possession. Since the incorporation of the second society, and until 1797, the town exercised every right over the land which it had enjoyed previous to that incorporation. But whether the property be in the town, or in the first society, is immaterial; in either case, the plaintiffs cannot recover.

*Bradley*, contra. If the plaintiffs are entitled to recover, it is by virtue of a conveyance from the first society.

To whom was this grant made ? Not to the town, as such, in their corporate capacity. The town could not direct the application of the profits to any purpose other than that designated in the sequestration. The town being a corporation could not be a trustee. The grantees are the inhabitants of the town; and the construction has been, that the grant belonged to the first ecclesiastical society. *Sedgwick et al.* v. *Pierce*, 2 *Root*, 431. The inhabitants of each town, by law, form a corporation for ecclesiastical purposes. When part of the inhabitants in such town are constituted a new and distinct society, the remaining inhabitants are by law considered, for ecclesiastical purposes, as the same corporation, having continuance and succession by the name of the first society. *Huntington et al.* v. *Carpenter, Kirby*, 45.

These authorities establish the point, that upon the incorporation of the second society, the title to these lands remained in the first. Has the town since that incorporation acquired a possessory title ? If this be the case, the obligation to follow the intent of the sequestration is destroyed. The avails may be applied to discharge the ordinary expenses of the town. The town does not derive its title from the original grantors. It therefore follows that the town, by receiving and paying over to the support of the ministry the profits, has acquired a title to the lands discharged of the use designated by the grantors. The consequence is absurd, and the premises false. The right, then, remained with the first society till the conveyance made to the second.

But if it should be considered that the two societies were tenants in common, it will equally answer our purpose. In either case, the release by the first society, being an equitable compliance with the intent of the donors, the conveyance, being to the uses limited by the grantors, gives a good title to the second society.

J. C. SMITH, J. It would be difficult for the plaintiffs

to make out their title to the lands in question upon
principles known to the common law. The original
grant or appropriation, together with the subsequent dis-
positions of it, will derive little support from the deci-
sions of *Westminster-hall*, or from the maxims of *En-
glish* jurisprudence. But the early usages of our an-
cestors, confirmed by a long course of adjudications, and
incidentally recognised by statutes, have established cer-
tain principles from which we are not at liberty to de-
part, and which are decisive of most of the points ari-
sing in the present case.

The proprietors of a tract of land intended for a town
may appropriate or set apart a portion of their territory
for the support of the gospel ministry; and this is
deemed a valid alienation, although there is neither
alienee nor trustee then *in esse*.

Whenever the town is incorporated, it is at once pos-
sessed of an *ecclesiastical* as well as civil capacity.

In virtue of the former, it has power to call and settle
ministers, to build places of public worship, to receive
and hold real and personal estates for those uses, and to
manage such lands or funds as may have been originally
dedicated to the same purposes.

The town continues to perform these functions until a
portion of the inhabitants shall be formed into a separate
ecclesiastical society.

By this operation the remaining inhabitants become in
fact, and in name, the *first* society, and, as such, are in-
stantly vested with all those rights which the town in its
ecclesiastical capacity had before exercised. The town
thenceforth loses its twofold character. It can no longer
interfere in parochial affairs, but exists wholly as a civil
corporation.

Whatever might have been my opinion if this were a
case *prima impressionis*, I now feel myself bound to re-
gard these as fundamental principles. They are so tho-
roughly interwoven with our whole system of tenures,

that to disturb them would be equally inconsistent with private justice and public policy.

From these premises the conclusion is evident, that as the two societies were formed in 1740, the lease executed to the defendant by the *town* of *Suffield*, in 1794, can be of no validity, unless another part of the defence in this case is to prevail. It is said the town by long and uninterrupted possession has acquired to itself a title, subject, indeed, to the same uses, but with the right of applying the avails at its own discretion. A satisfactory answer to this claim is already furnished so far as it is founded upon occupation or possession prior to the year 1740. Since that period, it is not pretended the town has used or occupied the lands in any other manner than by *leasing them annually, and paying over the rents to the ministers of the two societies.* Is here, then, an *adverse* possession by which title is to be gained? The idea is utterly excluded by the very terms in which the proposition is stated. What right is acquired? The right of executing an agency, (for it is nothing more,) troublesome in itself, and attended with no reward or emolument? Surely, in this view, the claim is entitled to as little indulgence. If the first society, who had by law the control of the property, permitted the town or selectmen to manage it as they had done before the societies were formed, it was, probably, from a confidence that the trust would be faithfully executed. But this trust or confidence is not a subject of prescription. It might be at any time withdrawn; and that it had already continued too long is apparent from the extraordinary terms of the contract made with the defendant.

A farther objection is urged by the defendant's counsel, which would seem to deserve a more serious answer. It is argued, that as the act of incorporation in 1740 is silent with respect to the ministerial fund, it must, according to one of the rules before mentioned,

6

June, 1810.

HANGHETT
v.
KING.

belong to the first society exclusively. To divide, there-
fore, or yield any portion of it to the second society was
an unlawful, a void transaction; and, of course, no title
was conveyed to the plaintiffs. The objection admits
that a partition might have been made under the sanc-
tion of the legislature. Now, if the first society had
the power to alienate in this manner, the interference
of the legislature was unnecessary. If no such power
exists, a doubt may well arise whether it could be con-
ferred even by the legislature. For, if an alienation
contrary to law works a forfeiture, and the estate re-
vests, can an act of the legislature prevent the forfeiture,
and thus defeat the right of the reversioner? But it is
not understood that legislative interposition is required,
or, indeed, ever exercised, in such cases, unless upon
the express agreement of the societies concerned, and
then not so much for the purpose of giving effect to the
transaction, as to preserve the evidence of it. The ori-
ginal grant was doubtless designed for the benefit of all
the inhabitants within the limits of the town, who might
be disposed to partake of it; and so long as they re-
mained a single community, all participated alike. When
different ecclesiastical corporations were formed, the
fund would regularly remain with the first society. They
could by law retain the whole. But if they were dis-
posed to divide it with their brethren, it cannot be said
the intent of the donors would be defeated. On the
contrary, the arrangement was a fair and equitable fulfil-
ment of that intent, and, in my judgment, was not in-
compatible with any legal principle whatever.

It cannot be necessary, in the decision of this case, to
inquire whether, as the deed to the plaintiffs refers ex-
pressly to the lease, the validity of the latter is not
thereby admitted; for even allowing such to be the effect,
still as the reversion is likewise conveyed to the same
uses, and as the conditions both of the lease and the

mortgage have become forfeited, the legal title must be in the plaintiffs.

I am therefore of opinion, the verdict ought to stand, and that the rule for a new trial be discharged.

In this opinion the other judges severally concurred.

New trial not to be granted.