JULY TERM, 1854. 255

The Second Eccl. Soc. of Portland *v.* The First Eccl. Soc. of Portland.

## THE SECOND ECCLESIASTICAL SOCIETY OF PORTLAND *VS.* THE FIRST ECCLESIASTICAL SOCIETY OF PORTLAND.

Since the adoption of our present state constitution, however it may have been before, it is not competent to the legislature to divide an ancient local, or territorial ecclesiastical society, into two or more such societies, or to divide the fund, owned by such ancient society, for the support of the ministry, and to assign a part of such fund to a new society, formed out of a portion of such ancient one.

The defendants, the First Ecclesiastical Society of P, having been incorporated by the general assembly in the year 1714, as a local ecclesiastical society, with territorial limits, embracing the inhabitants within that part of the then town of M, which was on the eastern side of the Connecticut river, and having acquired by grants, devises and donations, a fund for the support of religious worship within said society, consisting of real and personal estate ; the legislature passed a resolution, in the year 1853, on the application of certain members of said society, residing in the eastern portion thereof, but against the remonstrance of said society, and of several members thereof, who resided in said eastern portion thereof, on general reasons of convenience, and expediency, and without any claim or finding that said fund had been misapplied, or otherwise forfeited by said society, by which they divided said society, and constituted the members, living in said eastern portion thereof, a new local, ecclesiastical society, by the name of the Second Ecclesiastical Society of P, with territorial limits embracing that portion, and declared that said new society should be entitled to, and by said resolution, vested in it, one undivided half of said fund belonging to the old society, and made provision for the division of said fund between the two societies, accordingly. The defendants refused to comply with said provision, or to relinquish any part of said fund. On a bill in equity, by suchnew society, to compel such division, it was held, 1. That, if the effect of such resolution was to constitute those on whose application it was passed, which was the utmost that could be claimed for it, a new voluntary society, it was ineffectual so far as it attempted to give any such new society any part of the funds, or property of the old one. 2. That, if it had not even that effect, it left the old society, in all respects, in its former condition. 3. That, consequently, such old society retained all its property and funds.

THIS was a bill in chancery brought by the Second Ecclesiastical Society of Portland, against the First Ecclesiastical Society of Portland, to compel the defendants to make a division between the two societies of the fund, for the support of religious worship, and other corporate property belonging to the defendants.

The bill alleged, substantially, that certain members of said First Ecclesiastical Society brought their petition to the general assembly of this state in May, 1853, praying that said society and the lands, and other property belonging thereto, should be divided, and a new ecclesiastical society formed of the portion of said society, so to be divided and set off, and that a portion of said lands and other property so belonging to said First Society should be set off and appropriated to said new society. That said general assembly upon full hearing of the parties, found the facts averred in said petition to be true, granted the prayer of said petition and passed the following resolution.

" Upon the petition of Noah Strickland and other members of the First Ecclesiastical Society of Portland, praying for a division of said society, and of the lands and property thereto belonging, for the reasons in said petition set forth; said petition was duly served and returned, and the parties, petitioners and respondents appeared and were fully heard, and upon such hearing this assembly do find:

" That the said First Ecclesiastical Society, of Portland, is an ancient local society, being formerly known as the First Ecclesiastical Society of Chatham, and its limits are nearly coextensive with those of the present town of Portland.

" That the petitioners are members of said society, and mostly reside in the eastern section thereof.

" That the said society are the owners of a valuable interest in the old burying-ground, so called, situate near and upon the stone quarries in said Portland, which interest said society has owned ever since its organization, which was about one hundred and fifty years since, and the petitioners, in common with other members of said society, have from time to time paid their proportion of all expenses connected with the care and preservation thereof, including heavy expenses of litigation in protecting the right of said society thereto.

" That said society are also the owners of a fund for the

support of religious worship within the limits of said society, the amount of the same exceeding the sum of eight thousand dollars, well invested and productive.

" That said society are also the owners of a piece of land containing about two acres, situate in Pacouset meadows (so called) in said Portland, and formerly owned by Ezra Bevins, now deceased.

" That said funds accrued mainly from subscriptions and devises, more than one-half of which were given by persons then residing in the eastern section of said society.

" That for many years prior to 1850, there was but one Congregational church edifice within the limits of said society; that the same was used by the members of said society for all the ordinary purposes of a church edifice, and was situate about half a mile east of the Main street in said Portland.

" That the above mentioned site of said church was very far west of the geographical centre, and also of the centre of population in said society.

" That as long ago as the year 1843, the old church edifice had become so much dilapidated that it became desirable, and the society were of that opinion, that a new church edifice should be erected, but it was soon found that a disagreement existed as to the site.

" The members of the society living east of the old church, for the sake of harmony, and as the then existing site had been the location of the church for many years, were willing that a new church should be erected there, yet a minority consisting of members living westerly of said site, and principally residing on the street, so called, would not agree to said location for said new buildings, and would consent to no location except upon said street, which is upon the western extremity of said society.

" This assembly further find that after several years of controversy, in the year 1850, two new Congregational churches were erected in said society, one on the street as above

described, the other about one mile easterly from the street, and about half a mile easterly from the site of the old church.

"The old church about the same time was torn down, and the lot on which the same stood was sold.

"The new church on the street was built under a pretended vote of the society, but the assembly do not find whether the same was or was not a legal vote.

"The new church on said eastern site was built by the petitioners, with some aid from other persons residing within the limits of said society : a church has been organized there, and public worship has been maintained there regularly, ever since the erection of said building, according to the Congregational form, and at the expense of the petitioners and others there worshipping.

"This assembly further find that the eastern church above named is nearer the territorial centre and the centre of population of said society, either than the church on the street or than the site of the old church.

"That the number of church members at the east church is about one hundred, and is greater than the number at the west church. That the number of families now regularly attending at the eastern church, is about eighty-six, and is greater than the number regularly attending at the western church.

"The grand levy of those regularly attending at each of said churches, is about equal.

"That the said eastern church is the only house of public worship in use in that section of the society, while in the western section there are several other churches of different denominations, where public worship is regularly attended. That a large proportion of the population of the western portion of the society is attached to other ecclesiastical societies than the Congregational, while, in the eastern portion, most of the people attend the Congregational church. That, with a division of the fund, the institutions of the Gospel could, and would be liberally and permanently sup-

ported in each of said churches, and with more advantage to the said society and to the community at large, than if confined to but one of said churches.   That the existing state of feeling, between the different portions of said society, is such that their future union is impracticable.

" That the funds and property of said society were originally given and received, for the benefit of the Congregational denomination within the said territorial limits of said society, and that in the event of a division of said society, the said funds and property will be more effectually continued to the uses for which the same were given, according to the true intent and meaning of the donors, by a division thereof, than if the whole were suffered to remain in the hands of a part only of said original society.

" That the best interests of said society, and of the Congregational denomination within said society, require a division of said society and said fund, and the division of each as made by this resolve is just and equitable.

" *Resolved,* That the present First Ecclesiastical Society in Portland be, and the same hereby is divided into two societies as follows.

" All the members of said ecclesiastical society, residing in that portion thereof, bounded northerly by the town of Glastenbury, east by the town of Chatham, south by Connecticut river, and west by school districts, numbers one, two and five, in said town of Portland, including such portions of district number one, as are situated east of the small stream known as Crooked brook, shall be and remain one distinct ecclesiastical society, by the name of the Second Ecclesiastical Society of Portland, with the local limits above described.   And all the members of said present First Ecclesiastical Society, residing in that portion thereof situate westerly of the part above described, shall be and remain a distinct ecclesiastical society, by the name of the First Ecclesiastical Society of Portland, with the local limits last above described: each of said societies thus constituted,

shall be and are hereby vested with all the powers and immunities which other ecclesiastical societies do and may possess and enjoy.

" The officers of said first society, as heretofore existing, shall continue to be officers, for the current year, of said first society as constituted by this resolution.

" The members of said second society are hereby empowered and directed to meet, at some convenient time and place within the limits of said society, to choose officers for the current year, pursuant to a warning to be given under the hands of Enoch Sage and Job Payne, or either of them, to be posted in two public places within said society, at least five days previous to such meeting.

" Each of said societies as hereby constituted, shall be entitled to one undivided half of the following described property, now belonging to said first society, as heretofore existing, *viz.*

" The interest of said first society, as heretofore existing, in the old burying-ground, situate in or near the quarry in said Portland.

" The piece of land, herein before described, situate in Pacouset meadow in said Portland.

" The fund of said society, amounting to over the sum of eight thousand dollars, and consisting, as is supposed, principally or entirely of promissory notes, mortgages and bank stock.   One undivided half of said property as aforesaid is hereby declared to be, and is vested, in each of said societies as constituted by this resolution, and said first society is hereby required, upon demand from said second society, to execute to said second society, in due form of law, proper and legal transfers and conveyances of the interest of said second society, as vested in said second society, by the terms of this resolve.

" The Hon. John Stewart, of Chatham, is hereby appointed a committee, with full power to repair to said Portland and make an equal and just division in severalty, between said

first and second societies, of the personal property constituting said fund as herein before described, he first giving notice to the committees of said societies, or to three of the principal inhabitants of each, of the time and place of his performing the duties of his said appointment, and the person or persons having the possession or control of the securities, papers, and evidences of debt relating to said fund, shall upon demand, exhibit the same to said Stewart, and a written division of said property as aforesaid, when made under the hands of said Stewart, and delivered to the clerk, committee, or any one principal inhabitant of each of said societies, shall be final and binding in the premises, and a right in severalty to their respective proportions of said personal property, shall thereupon vest in each of said societies, pursuant to said written division of said Stewart, and said first society shall thereupon, on demand, deliver and transfer to said second society the property, stocks, securities or evidences of debt so vested in said second society, in severalty as aforesaid.

" The said land in Pacouset meadow, and all the property connected with said fund, and hereby divided, shall forever be appropriated by each society, within their respective limits, for the purposes for which the same were originally given and granted.

" The said church on Portland street, and all the other property of said First Ecclesiastical Society, as heretofore existing and not herein divided, shall be and remain the property of said First Ecclesiastical Society, as hereby constituted, and the debts due from said First Ecclesiastical Society, as heretofore existing, shall be and remain the sole and proper debt of said First Ecclesiastical Society, as hereby constituted, said debt having accrued by reason of the building of said church."

The bill then alleged that a large portion of the members of said first society, residing within the limits assigned to said second society, met pursuant to a warning which had

been previously given, and chose a society committee and other customary officers, according to the terms of said resolution, and that the plaintiffs became, and ever since had continued to be, duly constituted and organized according to law.

That they thus became, and had ever since been justly entitled to one undivided half of the property described in said resolution; but said first society neglected and refused to make or execute any transfer or conveyances of the same, and retained the whole in their hands, and appropriated the same to their own use.

The bill then prayed for a decree, under some suitable penalty, that said first society within such time, as said court might limit, should execute and deliver to the plaintiffs, legal and proper transfers, and conveyances of the interest of the plaintiffs, as vested in them, in and to said property by the terms of said resolution. And that said first society and their committee, and treasurer, or other officer or agent, having possession or control of said securities, papers, evidences, &c., should exhibit to said Stewart the securities, papers, and evidences of debt, relating to said fund, upon notice and demand, according to the tenor of said resolution. And that said first society, when the said Stewart should have made a written division of said property as aforesaid, under his hand, and delivered the same to the clerk, committee, or one of the principal inhabitants of each of said societies, should, thereupon, on demand, deliver and transfer to the plaintiffs, the property, stocks, securities or evidences of debt, so vested in them in severalty, with their share of the dividends, profits or interest accruing from the same.

The defendants filed an answer to the bill, averring substantially that they are an ancient local society, constituted in the year 1714, by the general assembly, comprehending within their local limits, the whole of the territory now claimed by the plaintiffs; that some of the plaintiffs upon whose application the resolution of the general assembly

set forth in the bill of the plaintiffs was passed, were at the time of the passing thereof, members of said first society, and resided in the eastern section thereof; that the right of the defendants to the burying-ground mentioned in said resolution, is derived from the grant, made by the inhabitants of the town of Middletown at a town meeting, held January 13th, 1712, to the defendants for a burying-place, and from the possession and continued occupation of the premises by the defendants, from the time of their incorporation in pursuance of said grant, and for the purpose aforesaid; and that the defendants have never prohibited the plaintiffs, or any other person or persons, from using the same as a place of burial for the dead, for which use the same was granted to the defendants, and dedicated as aforesaid; that the property, belonging to the defendants, (exclusive of the said burying-ground,) and of which the plaintiffs claimed one-half, by virtue of said resolution of the general assembly, was given to the defendants partly by Ezra Bevins, deceased, by his last will and testament; who devised to said society a portion of said real estate, for the support of the gospel ministry in said society, forever, and directed, " That the avails and rents of ' said land and tenants be applied only for the support of the gospel ministry in said first society, by abating the rates or annual proportion of the stipulated salary, of such persons, who, in the judgment of the society's committee, from time to time, are the most indigent, or stand in most need of assistance and relief;" partly by Jonathan Brown, who gave the same by his last will and testament, to said society in trust, with the annual rents, profits or interest of the same without diminishing the principal, to help to maintain and support a gospel ministry in said society; partly by vote of the town of Middletown, and partly by a subscription; that the funds and property of the defendants, whereof the plaintiffs claim one-half, as aforesaid, accrued wholly from the said grants, devises, bequests and subscriptions; that there never was but one Congrega-

tional church edifice, within the limits of said first society, until the year 1850, when it became necessary, in consequence of the decay of the old church, to take the same down and to erect a new one, and by a legal vote of the said first society, the site of such new church was fixed on the street in said Portland, and the same was built on the said street accordingly, and all the votes and proceedings in selecting such site, and building said new church, were in conformity to the law in such cases made and provided; that, afterwards, a minority of said society, being displeased with said site, although the same was much nearer to the centre of the said first society than the old church, proceeded to erect and did erect, on their private account, a place of worship in the eastern part of said first society, and thereupon presented to the general assembly, at the session thereof in May, A. D. 1853, the petition, on which the said resolution of the general assembly is professedly founded; that, after said petition had been served on the defendants, they held a special meeting, and passed votes to defend against said petition, and, in pursuance of such votes, the defendants, by their agents, appeared before the said assembly, and made defence against said petition, and remonstrated against the passing of said resolution; that sundry members of said first society, living within the limits assigned by said resolution to the plaintiffs, also appeared before said assembly, and remonstrated against the passing of the said resolution, and, in opposition to their remonstrance and contrary to law, they were, by the general terms of said resolution, classed with, and associated to the plaintiffs, as a religious society, by local limits, but have not voluntarily associated themselves with the plaintiffs, or separated themselves from the defendants. The defendants admitted that they constantly refused to make partition of of said property, and to transfer one-half thereof to the plaintiffs, as required by the said resolution of the general assembly, and as prayed for by the plaintiffs; and insisted,

that they are not, by law, bound to make such partition or transfer, or to consent thereto; that such partition and transfer would be a violation of the vested rights of the defendants, and of the members of their society remonstrating as aforesaid, and utterly inconsistent with the declared will and intention of the donors of said property; that the defendants are trustees of the said property for a specific object, and have no power to divide or alienate their trust; and that the said resolution is not law. The defendants averred that all the facts pretended to be found by the said general assembly, in and by said resolution, and all and singular the allegations of said bill of the plaintiffs, except those which related to the calling of the meeting, and organization of the plaintiffs as a society, and to the demand and refusal to make partition of the property aforesaid, and the inability of said Stewart to make such division, and of said plaintiffs to obtain any part of said property or any knowledge thereof, and except those which are expressly admitted to be true, were not true, and if true, were insufficient in the law.

To this answer the plaintiffs demurred generally, and the questions thereon arising were reserved for the advice of this court.

*Perkins* and *McCurdy*, in support of the demurrer, contended, .

1. That the defendants are a local, ecclesiastical society, and the constitution did not destroy, but confirm local societies. This appears, in the first place, from the constitution of the state. Secondly, from the decisions of this court. *Atwater* v. *Woodbridge*, 6 Conn. R., 223. *McCloud* v. *Selby*, 10 Conn. R., 390. *Beardsley* v. *Smith*, 16 Conn. R., 376. *Jewett* v. *Thames Bank*, 16 Conn. R., 511. 7 Greenl. Ev., 411. Thirdly, from the acts of the legislature. Rev. Stat., p. 167, 171, 297. Private Laws, 530, edition of 1837. Fourthly, from the general practical understanding of similar acts of the legislature. Fifthly, it is conceded by the pleadings.

2. That local societies are subject to division, like towns, counties, &c. 14 Conn. R., 463.

3. If the first society cannot now be called in a strict sense, "local," yet it was incorporated as such, and has been so treated and considered, and a division is justified by the immemorial usage of this state. *Hanchett* v. *King*, 4 Day, 360. It is too late to question the constitutionality of the resolution. 13 Vt. R., 402. 2 Gill, 487.

4. The division of the funds is a necessary incident to the power claimed for the legislature and justified by the same usage. 4 Day, 360. *Dillingham* v. *Snow*, 3 Mass., 276. Private Laws, ed. of 1837, 538. *Tilden* v. *Metcalf*, 2 Day, 259.

*Baldwin* and *Barnes*, after remarking that the claim of the plaintiffs is founded entirely on the resolution of the general assembly, incorporating them into a new society, and directing a division of the property; and whether such act is to be regarded as a dissolution of the old society as a corporation, and the creation of two new societies, each comprising a portion of the local limits of the old, or as a special incorporation of the new society, leaving the old corporation in existence, it was valid so far as it incorporates those who have voluntarily become, or may hereafter become members of the new society; and, that, so far as it attempts to create a new located society, including members of the old, living within the local limits assigned to the new, it is an act of usurpation, not only unauthorized by the constitution, but expressly forbidden by it; contended,

1. That, although the defendants were originally, like all the societies of the then established order in Connecticut, a public corporation to a certain extent, yet, in regard to their funds, they were invested with the rights of a private corporation. The power of such societies to receive funds is a grant from the state, accepted, and acted upon both by the

society and the donors, who, on the faith of such grant, and the protection it assured, made their gifts and bequests.

2. That the constitution, Art. X., provides that the rights and duties of all corporations, then existing, shall remain as if it had not been adopted, with the exception of such regulations and restrictions as are contained therein. By Art. VII., it is provided, that each and every society, or denomination of Christians in this state, shall have and enjoy the same, and equal powers, and rights, and privileges, and societies, then in existence, became, whether originally located or not, mere private corporations, embracing as voluntary members all whom they then included in their associations, with perfect liberty to any members to withdraw, and form new associations at pleasure, leaving the society in the full possession of its corporate existence, or corporate rights; and, therefore, it is no longer in the power of the legislature, "by law to compel any person to join or support, nor be classed with, nor associated to, any congregation, church or religious association."

3. That, in pursuance of the guaranty of existing rights, so far as they were consistent with the constitution, provision was made by the law in relation to ecclesiastical societies, immediately after the adoption of the constitution, "that all societies and congregations, which have been incorporated in local limits or otherwise, or founded by voluntary association, shall hold, possess and enjoy all real and personal property, all public buildings and funds, belonging to such societies or congregations, appropriated to the use and support of public worship, and shall have power to take care of, manage and apply the same to such purpose, and shall be capable to receive grants, &c., and by voluntary agreement, to establish funds for the same object." Stat., 167.

These societies, having become mere private corporations, although conferring a public benefit, which is deemed a sufficient consideration for the grant of corporate privileges, the power of the legislature over them, as corporations, for

governmental institutions, ceased with the adoption of the constitution. 6 Cranch, 88. 9 Cranch, 43. 4 Wheaton, 637.

4. That, in 1853, said first society being a corporation composed only of members voluntarily associated as a body politic, and in that capacity holding property in trust, for the support of public worship, the general assembly had no authority to undertake to dissolve, and reconstruct it. It had committed no act, by which its private rights were forfeited, and no steps had been taken to have it judicially ascertained if it had; without which it is not subject to disfranchisement. 2 Kent Com., 306. 4 Wheat., 310. *Fletcher* v. *Peck*, 6 Cranch, 88. *Terrett* v. *Taylor*, 9 Cranch, 43. 3 Peters' Cond. R., 262. The legislature had no power to form a new society with local limits, to include members who have not voluntarily associated, nor thereby to separate from the old society any, who might choose to remain in it.

5. That whatever changes may be made by the voluntary withdrawal of members from the old society, the corporation itself remains in the enjoyment of all its rights, and all its property, by the long established law of this state, as fully as it originally possessed them. 4 Day, 367. 2 Root, 433. 3 Conn. R., 35.

6. That the legislature have no power to create a new religious society, with local limits, in the sense in which that term was applied to the old organization, before the adoption of the constitution. *Jewett* v. *Thames Bank*, 16 Conn. R., 516. Nor have they power to divide the funds of the defendants between the old corporation and any new society they might create. 9 Cranch, 43. 3 Pet. Cond. Rep., 260. 4 Wheat., 318.

7. That the society itself could not, as the superior court have held, *Langdon* v. *Plymouth Soc.*, 12 Conn. R., 113, give back their funds to the donor. They were trust funds, confided to their management, and not to the control of the legislature, or of any new association they might incorporate.

STORRS, J. The defendants, the First Ecclesiastical Society of Portland, were incorporated by the general assembly, in the year 1714, as a local ecclesiastical society, with territorial limits, embracing the inhabitants within that part of the then town of Middletown, which was on the east side of Connecticut river, and acquired, by grants, devises, and donations, a fund for the support of religious worship, within said society, consisting of real and personal estate. In the year 1853, on the application of certain members of said society, residing in the eastern portion thereof, but against the remonstrance of said society, and of several members thereof who resided in said eastern portion thereof, on general reasons of convenience and expediency, and without any claim, or finding, that said fund had been misapplied or otherwise forfeited by said society, the legislature passed a resolution by which they divided said society, and constituted the members living in said eastern portion thereof a new local ecclesiastical society, by the name of the Second Ecclesiastical Society of Portland, with territorial limits embracing that portion, and declared that said new society should be entitled to, and by said resolution vested in it, one undivided half of said fund belonging to the old society, and made provision for the division of said fund between the two societies accordingly. The defendants refused to comply with said provision or to relinquish any part of said fund, and the object of the present bill is to compel such division between them and the plaintiffs, the said new society.

The defendants claim that, whatever was the effect of that resolution as to those members of the old society on whose application it was passed, it is unconstitutional in regard to that society as a corporation, and all the members thereof, other than those applicants, on the ground that it is a violation of the seventh article of our constitution, prohibiting any person from being compelled by law to join or support, or be classed with, or associated to, any congrega-

tion, church or religious association, and also of the act of 1702, " For securing estates given to charitable uses," and the acts rëenacting and confirming it, (with only circumstantial variations of phraseology, in each subsequent revision of our statutes, whereby its provisions have been continued in force to the present time,) by which it was provided that all lands, tenements, and other estates, that had been, or should be, given or granted, by the general assembly, or any town, or particular person, for the maintenance of the ministry of the gospel, or schools of learning, or for the relief of the poor, or for any other public or charitable use, should forever remain and be continued to the use to which they had been, or should be given or granted, according to the true intent and meaning of the grantors, and to no other use whatever.   R. Stat. 1821, tit. 56, ch. 1, sect. 3.   R. Stat. 1835, tit. 58, ch. 1, sect. 3.   R. Stat. 1838, tit. 57, ch. 1, sect. 3.   R. Stat. 1849, tit. 29, ch. 1, sect. 3.

The defendants also claim that as to the applicants for the passage of that resolution, its legal effect was not to incorporate them as a local ecclesiastical society with territorial limits, or to invest them with the attributes or qualities of such a society, but only, at the utmost, to incorporate them as a new, voluntary religious association of individuals, with the rights only of such a voluntary society, and that as such, upon being thereby so voluntarily disconnected from the old society, to which they previously belonged, they would become mere seceders therefrom, and would therefore cease to retain, and could not be legally invested with, any right to control, enjoy, or participate in any of its funds.

If the effect of that resolution was to constitute those applicants for it a new voluntary society, (a point which we deem it unnecessary to decide,) it is clear that, by virtue of it, none but those applicants would belong to that society, since, as to the other members of the old society, their consent, without which they could not be incorporated with such voluntary society, would be wanting ; and therefore

they would continue to be members of the old society, which would be unaffected by that resolution, excepting that the number of its members would be diminished by the withdrawal of those thus thereby incorporated into the new society. The existence or identity of the old society is not destroyed by the diminution of the number of its members; and with respect to those who voluntarily withdraw from it, it is well settled in this state, that by such secession they lose all right to hold, appropriate, participate in, or control any of its funds which it had received for the support of the ministry. Nor, if they should form a new voluntary society, would it, in our opinion, be competent for the legislature to vest in them, or appropriate to their use, any part of such funds. An attempt by the legislature to do this would be a diversion of the fund from the objects and purposes for which it was given, and would therefore be unauthorized as being in violation of the act of 1702, before mentioned, and the acts by which its provisions have been reënacted, which have always been held by our courts to constitute a compact between the state and the donors of property to ecclesiastical societies for the maintenance of the gospel ministry, inviolable even by the state itself. And we are not informed of any instance, in which the legislature have ever undertaken to transfer any portion of the funds of a local society, given to it for that purpose, to a voluntary ecclesiastical society, formed of a part of its members, and which would be merely a private corporation.

We do not understand the plaintiffs as controverting any of these principles, or as insisting that, if they are to be considered as a voluntary society of seceders from the old society, they would have a right, under the resolution in question, to participate in any of the funds of the latter; but they claim that the members of their society, having been originally an integral part of the old society, were by that resolution, or must be deemed to have been, involuntarily separated from the latter society, and constituted another

local ecclesiastical society, embracing within its limits a portion of the territory, originally comprehended within the limits of the old society, and that thus the legislature, by that resolution, only divided, for purposes of convenience and expediency, the old society; that they, the plaintiffs, having been so detached from the latter, were, on such division, equitably entitled to their equal proportion of its funds, and that it was, therefore, competent and proper for the legislature, not only so to divide the old society, but also, on such division, to divide its funds between that society, and the plaintiffs' new society, which was thus formed from it. And, in support of the legality of the resolution in question, in purporting to accomplish these purposes, they rely on the admitted power of the legislature, previous to the adoption of our present state constitution, to create local or territorial ecclesiastical societies, and to divide those already existing, at its pleasure, and, on the division of such a society, to divide its funds between it, and the new society, or societies formed from it, and the constant exercise of such power, from the earliest settlement of the state down to that period, and its exercise also in several instances thereafter. And they insist that there is nothing in that constitution, which varies or impairs the former power of the legislature, in these respects.

There is no doubt that, from the earliest period of our government until the adoption of our present constitution, the general assembly constantly exercised the power of establishing and dividing local ecclesiastical societies, and on such division, of dividing the funds of the societies so divided, as claimed by the plaintiffs. During that period, provision for the support and maintenance of religious instruction and worship was considered to be a duty resting on the state, as much as the promotion of general education, the support of the poor, or the maintenance of roads and bridges; and that provision was made and carried into effect through the instrumentality of local ecclesiastical societies,

established by the state, through its legislative power, as those other objects respectively were accomplished through the agency of school societies, and districts, and of towns. Each of these societies, or communities, were considered to be, and were in fact, municipal, public, political corporations. They were governmental instrumentalities, composed of individuals, as component parts of the great community, for the promotion of the general welfare of that community, and in which no person had an interest, or was to derive a benefit, of a character particular or individual to himself merely, but only in connexion with, and as he participated in, the welfare of the community generally; and not associations of individuals as such, created for their mere personal or private advantage, like ordinary private corporations; and they were established by the general assembly for the purpose of accomplishing, within their respective limits, the objects for which they were instituted, more conveniently than they could be accomplished, directly, by the general assembly itself. The promotion of those objects was a public duty, enjoined by law on the members of such corporations, which consisted of all the inhabitants residing within their limits, with the exception of certain individuals in ecclesiastical societies, who were, by particular provisions, excused from taxation for the religious objects of the society. And there was no legal objection to the exercise of this power by the general assembly, in which body was vested the whole legislative power of the state, and on which no restraint, in relation to either of these subjects, had been imposed by the people. To pass by those other *quasi* corporations, as those, and other similar territorial, or local municipal societies, are termed, it is obvious that, under that system, the maintenance and regulation of religious instruction and worship was considered to be a matter appertaining to the government of the state, and that, in the regulation of it, through the agency of these local societies, of one of which every part of the state formed a part, and every

inhabitant of which was liable to be taxed for the object for which they were instituted, every person was involuntarily attached to, and made a member of one of those societies, and therefore might be compelled to contribute to that object. In these two respects, the present constitution made a radical change in our ecclesiastical polity. The first section of the seventh article of that instrument, after declaring that it is "the duty of all men to worship the Supreme Being, the great creator and preserver of the universe, and their right to render that worship, in the mode most consistent with the dictates of their consciences," prescribes that " no person shall, by law, be compelled to join, or support, nor be classed with, or associated to, any congregation, church, or religious association." It further declares that every person then belonging to such congregation, church, or religious association, shall remain a member thereof, until he shall have separated himself therefrom, in the manner thereinafter provided; and the second section of the same article provides the mode, by which any person may separate himself from the society, or denomination of Christians, to which he may belong. And the third section of the tenth article declares, that the rights and duties of all corporations shall remain, as if that constitution had not been adopted, with the exception of such regulations and restrictions as are contained therein. The effect of these provisions is to leave it optional with every person, whether he will contribute for the maintenance of religion to any religious society, and if he chooses to contribute to any, to which he will so contribute. This results from the provision allowing any member of a religious society to secede therefrom, in connexion with that which prohibits any person from being compelled to join or support, or be classed with, or associated to, any religious society. The latter provision is very comprehensive, embracing those who belong to some such society, as well as those who do not; and prevents not only those who belong to no society from being compelled

to join or support, or be classed with, or associated to, any religious society, but also those who belong to any such society, from being compelled to remain in that society, or to join or support, or be classed with, or associated to any other. It clearly applies to the members of the First Ecclesiastical Society of Portland, the defendants in this case, and they are entitled to the immunities which were intended to be secured by it. The question then arises, whether the resolution of 1853 attempts to compel the members of that society, or any of them, to join, or support, or be classed with, or associated to any other religious society. On this point, its terms are too explicit to admit of a doubt. It purports to separate from that society that portion of its members, who reside in a particular section of it, therein defined, and to constitute them a new and distinct local society. And this it attempts to do, not only without, but expressly against the consent of the old society, and of a considerable number of its members, who reside within the limits assigned to the new society. The effect of this act, if valid, would be not only that those dissenting members would be compulsorily classed with, and associated to a religious society, to which they did not previously belong, but that they might also be compelled to contribute to the support of religious worship, and the building and repairing of houses for that purpose, in the society to which they would be thus attached, since the constitution provides that every society of Christians shall have power to tax its members for those objects. We are therefore of opinion that the resolution, as to those members of the old society, against whose consent the resolution was passed, whatever may be its operation as to those who assented to it, is an infringement of the rights secured to them by the constitution, and void. Hence it results that it was ineffectual, for the purpose of creating a new local society within any part of the territory embraced by the old one; that the limits of the latter remain unimpaired; and that those members of it, who did

not assent to the resolution, continue to belong to it. With respect to those, on whose application it was passed, and who therefore must have assented to it, it is not necessary to determine its effect. If it constituted them a new voluntary society, which is the utmost that can be claimed from it, it is invalid, so far as it attempts to give to such society any part of the funds, or property of the old one, for the reasons before mentioned. If it had not even that effect, it left the old society, in all respects, in its former condition, and it consequently retains all its funds and property.

A few instances have been adduced by the plaintiffs, in which the legislature, since the present constitution was adopted, have undertaken to divide local, ecclesiastical societies into two or more societies of the same character, and to apportion their funds among the societies into which they were so divided. Under what circumstances, or on what grounds, this was done in those cases, we have not the present means of ascertaining. There may have been, and it is not improbable that there were, some peculiar circumstances attending them, which relieved them from any constitutional objection, or, if not, such objection may not have been raised. However this may be, we should not consider the action of that body to be justly entitled to any decisive influence, on a question like this, which arose very soon after the constitution went into operation, and when it was a matter of uncertainty, growing perhaps, in a measure out of the terms of that instrument, how far the former ecclesiastical polity of the state was intended to be affected by it, and when also legislation would naturally, and inadvertently, receive, to some degree, a cast from the character of the former system.

For these reasons, a majority of the court are of opinion that the bill should be dismissed, and so advise the superior court.

In this opinion CHURCH, C. J., and ELLSWORTH, J., concurred.

WAITE, J.   In the opinion, expressed by a majority of the court, in this case, I am unable to concur, and as the question is one of deep interest to the people of this state, I feel it my duty, briefly to assign the reasons for my dissent.

For, if all our ecclesiastical societies, originally formed, within local limits, and which, from the very commencement of our government, have ever been treated by our legislature, and all our courts of justice, as public corporations, liable to be altered and changed, at the pleasure of the general assembly, have become transformed into private corporations, and placed entirely beyond all legislative control, so that all statutes respecting them, not made with their assent, are unconstitutional and void, then has a great change been made in our government, and a restraint placed upon our legislature, such as, in my judgment, was never contemplated by the framers of the constitution.

The principle becomes the more important, for, if evils should result from such an exemption from all legislative interference, and we need not look beyond the facts found by the legislature, in the present case, to perceive that there may be such, there is no remedy for them, short of a change in our constitution.

The great object of the first settlers of the colony of Connecticut, as well as those who settled the other New England colonies, was the support of religion.   Accordingly, those who settled the first towns, brought with them their ministers, and, says Trumbull, " the general court would not suffer a plantation to be made which would not support an able, orthodox preacher."   History of Connecticut, vol. 1, p. 200.

Whenever a town was settled and organized, it became at once possessed of an ecclesiastical as well as civil capacity. The inhabitants, in legal meeting, had power, by a major vote, to call and settle a minister, provide for his support, and for such purposes to impose taxes.   Stat., ed. 1769, p. 166.

The town continued to perform these duties, until a portion of the inhabitants, living within certain prescribed limits, were, by an act of the legislature, constituted a separate ecclesiastical society, when the residue of the inhabitants became another society, usually denominated the first society of the town. *Sedgwick* v. *Pierce*, 2 Root, 433. *Hanchett* v. *King*, 4 Day, 365. *Merwin* v. *Camp*, 3 Conn. R., 41.

"To support and maintain religious instruction and worship," says Church, J., "through the agency of these societies, was a public duty, enjoined by law; as much so, as to promote education, by means of common schools; or to support the poor, and maintain roads and bridges, through the agency of towns." *Jewett* v. *The Thames Bank*, 16 Conn. R., 516.

The societies thus formed, and the towns in which there was but one ecclesiastical society, were afterwards constituted school societies, with power to make provision for the support of schools, and, for that purpose, to divide themselves into school districts.

These towns, ecclesiastical societies, school societies and school districts, were considered to be, and in fact were, public municipal corporations, or rather *quasi* corporations, created for the performance of certain public duties, imposed upon them by law, and subject to such alterations and changes as the legislature might think proper to make, for the better performance of those duties. And the records of our legislature shew that such alterations and changes have, from time to time, been made, from the first settlement of the colony, to the present time, without any question as to their validity, until the present case.

The members of all these located corporations, by long usage, have ever been considered liable for the debts of the corporation, and, in this respect, no difference has hitherto been made between located ecclesiastical societies and other local corporations.

Thus, says Church, J., "the courts of this state, from a

time beyond the memory of any living lawyer, have sanctioned the usage, as one of common law obligation, and it has been applied, not to towns only, but also, by [legal analogy, to territorial ecclesiastical societies and school districts. *Beardsley* v. *Smith*, 16 Conn. R., 37.`

And again, "ecclesiastical located societies in this state have always been considered and treated as public corporations, as much so, as towns or school societies. All laws, therefore, creating, or establishing them, may be enacted, without any petition, or preliminary action on the part of any body." *Waterbury* v. *Platt*, 12 Conn. R., 192.

The liability of the members of such ecclesiastical societies seems also to have been recognized by this court, in other cases. *Atwater* v. *Woodbridge*, 6 Conn. R., 227. *McLeod* v. *Selby*, 10 Conn. R., 395.

The same doctrine is recognized in the states of Massachusetts and Maine. *Chase* v. *Merrimack Bank*, 19 Pick., 568. *Merchants' Bank* v. *Cook*, 4 Pick., 414. *Adams* v. *Wiscasset Bank*, 1 Greenl. R., 361. *Fernald* v. *Lewis*, 6 Greenl. R., 264.

In the former case, the court say, "the question," whether on an execution against a town or parish, the body or estate of any inhabitant may lawfully be taken` to satisfy it, "appears to have been settled in the affirmative, by a series of decisions, and ought no longer to be considered as an open question." "And there is clearly no distinction, in this respect, between the liability of an inhabitant of a town or an inhabitant of a parish."

In the case of *Jewett* v. *The Thames Bank*, this court held that the members of an ecclesiastical society, formed by the voluntary association of individuals, without territorial limits, were not individually liable for the debts of such society. But the counsel, who contended for such exemption, were careful to place their case upon the ground, that the society was without local limits, and therefore, not a *quasi* corporation, and upon that ground, the decision was based. 16 Conn. R., 511.

But it is said that the control of ecclesiastical corporations, by the legislature, has been taken away by the constitution of this state. If so important and radical a change was contemplated by the framers of that instrument, it is very remarkable that no express provision to that effect should have been inserted.

So far from that being the case, the contrary, as I think, is clearly implied from the clause, which says that " the rights and duties of all corporations shall remain as if this constitution had not been adopted, with the exception of such regulations and restrictions as are contained in this constitution." Art. X., sec. 3.

The design, as it seems to me, manifestly was, to leave all corporations, then in existence, as they previously had been, with some slight qualifications. Those that were public, or *quasi* corporations, were to remain such, and those of a private character were to continue private corporations.

And this appears to be in accordance with the opinion of this court in the case of *Atwater* v. *Woodbridge*, decided a few years after the adoption of the constitution, 6 Conn. R., 223. It was said by the counsel, in that case, " that the constitution had not destroyed the local limits of ecclesiastical societies," a position which seems to have received the sanction of the court.

The reasoning of the former chief justice of this court, in giving his opinion, in a recent case, may well be applied to the present. *The Willimantic School Society* v. *The First School Society in Windham*, 14 Conn. R., 469. There the legislature had divided a school society and its funds, and the defendants, as in this case, claiming that the legislature had no power to make such division, refused to pay over to the new society its share of the common funds.

But the court said, " the legislature, upon the division of towns and school societies, have always exercised the power, so far as we are informed, of making an equitable arrangement, as to the common property, and the common burthens,"

The Second Eccl. Soc. of Portland *v.* The First Eccl. Soc. of Portland.

and unless the power is taken away, by the constitution, it must exist, as before. That instrument provides that the rights and duties of all corporations shall remain, as if the constitution had not been adopted, except as changed by that instrument itself. That it was not intended to take away the power always exercised by the legislature, of dividing the local communities, is apparent from the fact, that the division of towns is expressly recognized in the third section of the third article of the constitution, providing that such new towns shall] be entitled to only one representative. And if the power to divide towns is not taken away, we know not where the power to divide minor communities of a similar character is taken away. And if the right remains in the legislature, of taking away from such corporations a portion of their inhabitants, for whose use the funds were given, it would seem to follow that they must have a right to apportion those funds, in such manner, as to do equal justice to all concerned."

These remarks were indeed made in reference to the division of a school society, but they are equally applicable to the present case, unless there be something in the constitution distinguishing it from the former. An ecclesiastical territorial society was as much a public municipal corporation, or, in the language of the court, a minor local community, as a school society, and both were originally embraced within the same limits.

Stress is laid upon that part of the constitution which provides that no person shall be compelled to join any religious association, and prescribes the mode in which a member may separate himself from the society to which he belongs. But these provisions do little more than carry out principles, which had previously been recognized by the legislature, in relation to religious toleration, and are not, at all, incompatible with the full exercise, in all other respects, of all the powers previously possessed by the legislature, in reference to religious corporations. Besides, the constitution

was intended, not as a grant of power to the legislature, but as a limitation of the power previously possessed, and therefore, it retains all it ever had, except so far as it has been expressly taken away. *Starr* v. *Pease*, 8 Conn. R., 547.

Again, it is said that the locality of our ecclesiastical societies is destroyed, by the laws authorizing the admission of members, residing without their original territorial limits. But such admissions do not destroy the locality of the society. That will remain, as well as that of a corporation expressly located, by the terms of its charter.

It is also said that individuals have been made members of the new society against their wishes, and in violation of that clause in the constitution, providing that no person shall be compelled to join any religious community. But the legislature, in dividing the old society of Portland, intended no compulsion upon those made members of the new society. If any one of them was unwilling to become such member, he had but to manifest his dissent, in the simple mode prescribed in the constitution, and he became at once and forever absolved from all obligations to that society.

The legislature, in incorporating a railroad company, frequently declares in the charter that certain persons therein named and their associates, shall constitute a body corporate. Yet no one ever supposed that any one of those named, was compelled to become a member of the corporation, or that his refusal to act would affect the rights of the others, who were disposed to accept the grant of corporate powers.

Another circumstance strongly confirms the view here taken of this question. The legislature in repeated instances, since the adoption of the constitution, have exercised the same power over ecclesiastical territorial communities, which they previously possessed, without question or objection, until the present case arose. This practice for so long a period, now more than thirty years, with the entire acquies-

cence of the community, furnishes high evidence of the true construction of that instrument, and the general understanding of the community upon the subject.

Finally, it is said that the legislature had no power to divide the funds of the original society, or take from the defendants any portion of them.

But the case, last cited, shews very satisfactorily, that if the legislature had power to divide the society, they had power also, in conformity with immemorial usage in this state, to apportion the funds in such manner as to do equal justice to all concerned: this they have done and nothing more.

The division was made at the request of certain members of the society. The general assembly, upon due enquiry, found certain facts, among which are the following, appearing upon the face of the bill. That the society had two houses for public worship; that the then existing state of feeling, between the different portions of the society, was such that their future union was impracticable; that the funds of the society were originally given for the benefit of the Congregational denomination, within the territorial limits of the society; that in the event of a division of the society, those funds would be more effectually continued for the uses, for which they were originally given, by a division of them, than by suffering the whole to remain in the hands of a part of the society; and that the best interests of the society required that a division of the society and its funds should be made.

The general assembly accordingly passed a resolution, making the division, which they found and declared to be just and equitable. If, under those circumstances, the general assembly had no power to interfere, in the manner they did, I can only say that an unfortunate restraint has been placed upon the exercise of their legislative powers, and a wide departure made from the immemorial usages of our ancestors.

For these reasons, I am satisfied that the plaintiffs' bill is sufficient, and that the demurrer ought to be overruled.

In this opinion HINMAN, J., concurred.

Bill dismissed.