## FRANCIS H. SNYDER ET AL. *v.* TOWN OF NEWTOWN ET AL.

BALDWIN, C. J., KING, MURPHY, MELLITZ and SHEA, Js.

Argued February 2—decided May 31, 1960

*Philip Reich,* with whom was *George Balter,* for the plaintiffs.

*James J. O'Connell,* with whom were *Thomas J. Dolan* and, on the brief, *Albert L. Coles,* for the defendants John M. Ross et al.

*Henry F. Cooney* appeared for the defendants Sarah J. Holian et al.

BALDWIN, C. J. This action for a declaratory judgment and injunctive relief was brought in Septem-

ber, 1958, and was reserved upon stipulated facts for the advice of this court. The plaintiffs challenge the constitutionality of what is now General Statutes § 10-281, concerning transportation for pupils in nonprofit private schools.[1] The statute, so far as the facts here are concerned, purports, in subsec-

---

[1] "Sec. 10-281. TRANSPORTATION FOR PUPILS IN NONPROFIT PRIVATE SCHOOLS. (a) Any town, city, borough or school district may provide, for its children attending private schools therein, not conducted for profit, when a majority of the children attending such school are from such municipality, any transportation services provided for its children attending public schools. Any such municipality which on October 1, 1957, was providing such services may continue to furnish the same until an official determination to the contrary is voted under the provisions of subsection (b) hereof. (b) The chief executive authority of any such municipality shall, upon petition of at least five per cent of the electors as determined by the last-completed registry list, submit the question of determining whether the services specified in subsection (a) may be so provided to a vote of the electors of such municipality at a special meeting called for such purpose within twenty-one days after the receipt of such petition. Such petition shall contain the street addresses of the signers and shall be submitted to the municipal clerk, who shall certify thereon the number of names of electors on such petition, which names are on the last-completed registry list. Each page of such petition shall contain a statement, signed under the penalties of perjury, by the person who circulated the same, that each person whose name appears on such page signed the same in person and that the circulator either knows each such signer or that the signer satisfactorily identified himself to the circulator. The warning for such meeting shall state that the purpose of such meeting is to vote on determining whether the services may be provided. Such vote shall be taken and the results thereof canvassed and declared in the same manner as is provided for the election of officers of such municipality, except that absentee voting shall not be permitted. The vote on such determination shall be taken by voting machine and the designation of the question on the voting machine ballot label shall be 'For transportation for children attending private schools, YES' and 'For transportation for children attending private schools, NO' and such ballot label shall be provided for use in accordance with the provisions of section 9-250. If, upon the official determination of the result of such vote, it appears that the majority of all the votes so cast are in approval of such question, the provisions of subsection (a) shall take effect at the beginning of the next fiscal period of such municipality."

tion (a) to empower a municipality to provide transportation for pupils attending a nonprofit private school as well as for those attending public school, if the majority of the children attending the private school are from the municipality. Any municipality which was providing such transportation on October 1, 1957, the date the act went into effect, may continue to do so until a vote taken pursuant to subsection (b) of the act determines otherwise. Subsection (b) provides that upon the petition of at least 5 per cent of the electors on the last completed registry list of the municipality, the question whether transportation shall be furnished to private school pupils shall be submitted to a special meeting of the electors and, if a majority approves, the transportation shall be furnished as of the beginning of the next fiscal period of the municipality.

The stipulation and the admitted allegations of the complaint disclose the following facts: The plaintiffs are electors, citizens and resident taxpayers of the town of Newtown, which in September, 1958, had a population of approximately 9500 people and an area of approximately sixty square miles. Its fiscal year begins on October 1. Its total revenue for the year ending September 30, 1958, was approximately $750,000. There were, on October 1, 1958, 1487 pupils in the public schools, including the high school. St. Rose's Roman Catholic Elementary School, a private parochial school, is not conducted for profit. It is under the control and supervision of the ministry of the Roman Catholic Church, and the pupils are instructed in Roman Catholic tenets and doctrines. The canons of the Roman Catholic Church provide, in substance, that Roman Catholic children shall be taught nothing contrary to the Catholic faith and good morals and that religious

and moral training shall occupy the principal place in the school curriculum. In the elementary schools, the children must, in accordance with their age, be instructed in Christian doctrine, and the young people who attend the higher schools must receive a fuller religious training by priests conspicuous for their zeal and learning. Roman Catholic children are not allowed to attend nonCatholic schools except under circumstances and safeguards determined by the bishop of the diocese. St. Rose's School first opened on September 3, 1958, with 217 pupils, all from Newtown. As of June, 1959, there were four grades. The pupils are instructed by nuns. The school is accredited under the rules and regulations of the state board of education. See General Statutes §§ 10-4, 10-184, 10-188. Attendance at St. Rose's School satisfies the requirements of General Statutes § 10-184, which allows a child to attend a school other than a public school if he receives "equivalent instruction in the studies taught in the public schools," and § 10-188, which requires the teachers of private schools to keep registers of attendance and to make reports and returns similar to those received from the public schools. There is no other nonprofit private school in Newtown in which the majority of the children come from Newtown.

On October 1, 1958, 1413 pupils were being transported to the public schools in Newtown and 217 to St. Rose's School. The busses used were privately owned and were operated under a contract with the town board of education. The superintendent of schools established the routes. The regulations concerning transportation by school bus took into consideration the age of the pupils and the distance between their homes and the schools they attended. The regulations obviously sought to avoid the haz-

ards of highway traffic to pedestrians and to assist the children in getting to school in inclement weather. The routes proceed along heavily traveled state highways and state-aid and town roads where there are few sidewalks. They traverse sparsely settled rural areas as well as residential areas and business districts. The pupils attending the public schools and St. Rose's School share the same busses and have the same hours for school and the same school days. The cost of the transportation is paid from the general fund of the town, which includes moneys derived from property taxes, the school fund, and fees, licenses and permits. The furnishing of transportation to the pupils of St. Rose's School causes some additional expense to the town. The electors of Newtown had, on August 16, 1958, approved the supplying of this transportation, and it began on October 1, 1958.

In *Everson* v. *Board of Education,* 330 U.S. 1, 67 S. Ct. 504, 91 L. Ed. 711, the Supreme Court of the United States had before it a New Jersey statute which authorized district boards of education to make rules and contracts for the transportation of children to and from schools other than private schools operated for a profit. The boards provided reimbursement to parents for the fares paid to public carriers for transportation of children attending public and parochial schools. A divided court decided that the expenditure of tax-raised funds thus authorized was for a public purpose; that the statute did not violate the first amendment to the federal constitution, which prohibits any "law respecting an establishment of religion" and is made applicable to the states by the fourteenth amendment; and that the statute did not violate the due process and equal protection clauses of the fourteenth amendment.

Whether the exclusion of children attending private schools operated for profit denied them the equal protection of the laws was not discussed, since the question was not raised and the record failed to show that there were any children in the district who attended, or would have attended but for the cost of transportation, any school other than public schools and Catholic schools. Id., p. 4 n.2. The decision upheld a decision of the New Jersey Court of Errors and Appeals on the federal questions involved. *Everson* v. *Board of Education*, 133 N.J.L. 350, 44 A.2d 333.

The decisions of the Supreme Court of the United States on questions concerning the federal constitution are binding on the state courts. *Hempstead* v. *Reed*, 6 Conn. 480, 488; *Trustees of Bishop's Fund* v. *Rider*, 13 Conn. 87, 93; *State* v. *Palko*, 122 Conn. 529, 539, 191 A. 320; *Wojculewicz* v. *Cummings*, 143 Conn. 624, 629, 124 A.2d 886. Its decision in the *Everson* case, supra, disposes of the plaintiffs' claims under the federal constitution except in one respect, that is, that § 10-281, because it provides for the furnishing of transportation for children attending nonprofit private schools but not for children attending private schools conducted for profit, denies the latter the equal protection of the laws and discriminates against them. U.S. Const. Amend. XIV § 1. Whether § 10-281 is unconstitutional in that respect we are not now called upon to decide. It does not appear that any of the plaintiffs are persons who are being denied transportation because they are attending, or propose to attend, a private school conducted for profit. Since the plaintiffs are not members of the class which is claimed to be discriminated against, they cannot challenge the constitutionality of the statute on the ground in question. *McAdams*

v. *Barbieri*, 143 Conn. 405, 411, 123 A.2d 182; *Carroll v. Socony-Vacuum Oil Co.*, 136 Conn. 49, 59, 68 A.2d 299; 11 Am. Jur. 759, § 114.

The plaintiffs claim that § 10-281 violates article first, §§ 1 and 12, of the Connecticut constitution in that § 10-281 discriminates against those attending private schools conducted for profit and provides for the use of public funds for a private purpose. The equal protection and due process clauses of the federal constitution and the corresponding provisions of §§ 1 and 12 of article first of our state constitution have substantially the same meaning. *Karen v. East Haddam*, 146 Conn. 720, 726, 155 A.2d 921; *New Haven Metal & Heating Supply Co. v. Danaher*, 128 Conn. 213, 219, 21 A.2d 383; *State ex rel. Brush v. Sixth Taxing District*, 104 Conn. 192, 195, 132 A. 561. The plaintiffs are in no better position to raise the claim of discrimination under the state constitution than they are to raise it under the federal constitution. As regards their second point, it is true that a tax may not be imposed to provide funds to carry out a private, as distinguished from a public, purpose. *Beach v. Bradstreet*, 85 Conn. 344, 348, 82 A. 1030; *Lyman v. Adorno*, 133 Conn. 511, 515, 52 A.2d 702. But "[i]t is much too late to argue that legislation intended to facilitate the opportunity of children to get a secular education serves no public purpose." *Everson v. Board of Education*, 330 U.S. 1, 7, 67 S. Ct. 504, 91 L. Ed. 711; *Cochran v. Louisiana Board of Education*, 281 U.S. 370, 50 S. Ct. 335, 74 L. Ed. 913; *Interstate Consolidated Street Ry. Co. v. Massachusetts*, 207 U.S. 79, 87, 28 S. Ct. 26, 52 L. Ed. 111; *Forman Schools, Inc. v. Litchfield*, 134 Conn. 1, 9, 54 A.2d 710; see *Baker v. West Hartford*, 89 Conn. 394, 399, 94 A. 283; notes, 63 A.L.R. 413, 118 A.L.R. 806.

The "little red schoolhouse" maintained by a school district will ever have, for those who remember it, many happy associations. The present concept, however, is to bring pupils from far and near to a modern school building capable of housing all the grades necessary for a complete elementary or high school program. Distance, the frequent inclemency of the weather, and the hazards of automobile traffic make transportation of school children indispensable. It cannot be said that their transportation does not serve the purpose of education, and "[e]ducation in itself serves a public purpose." *Forman Schools, Inc.* v. *Litchfield,* supra, 9. It is clear, therefore, that the transportation of school children serves a public purpose, and the plaintiffs' argument on this point is untenable. A statute which serves a public purpose is not unconstitutional merely because it incidentally benefits a limited number of persons. *Amsel* v. *Brooks,* 141 Conn. 288, 297, 106 A.2d 152; *Barnes* v. *New Haven,* 140 Conn. 8, 14, 98 A.2d 523; *Warner* v. *Gabb,* 139 Conn. 310, 313, 93 A.2d 487; *State ex rel. Higgins* v. *Civil Service Commission,* 139 Conn. 102, 106, 90 A.2d 862; *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702.

The plaintiffs place their main reliance for constitutional invalidity upon article seventh, § 1, of the constitution of Connecticut.[2] The question is whether Newtown, by providing transportation for pupils of

[2] "[Conn. Const. Art. VII] Sec. 1. It being the duty of all men to worship the Supreme Being, the great Creator and Preserver of the Universe, and their right to render that worship, in the mode most consistent with the dictates of their consciences; no person shall by law be compelled to join or support, nor be classed with, or associated to, any congregation, church or religious association. But every person now belonging to such congregation, church, or religious association shall remain a member thereof until he shall

St. Rose's School, is compelling the plaintiffs, as well as other taxpayers in the town who are situated as the plaintiffs are, to support a parochial school and, by doing so, to support the Roman Catholic Church.

A very brief resume of the history behind article seventh, § 1, of our constitution, which was adopted in 1818, is helpful to an understanding of the meaning and intent of the language used. The preamble to the Fundamental Orders, Connecticut's, and the world's, first written constitution creating a government, states, after reciting the need for "an orderly and decent Government established according to God," that the founders, that is, the inhabitants of Windsor, Hartford and Wethersfield, do "associate and conjoin . . . to be as one Public State or Commonwealth; and do . . . enter into Combination and Confederation together, to maintain and preserve the liberty and purity of the Gospel of our Lord Jesus which we now profess, as also the discipline of the Churches, which according to the truth of the said Gospel is now practiced amongst us; as also in our civil affairs to be guided and governed according to such Laws . . . as shall be . . . decreed" in the manner provided in the subsequent orders. The founders were a homogeneous people belonging, for the most part, to what was to them the one and only church. Guardianship of that church was a basic

have separated himself therefrom, in the manner hereinafter provided. And each and every society or denomination of Christians in this state, shall have and enjoy the same and equal powers, rights and privileges; and shall have power and authority to support and maintain the ministers or teachers of their respective denominations, and to build and repair houses for public worship, by a tax on the members of any such society only, to be laid by a major vote of the legal voters assembled at any society meeting, warned and held according to law, or in any other manner."

policy with them, and they regarded the state as the secular arm of the church. See 1 Col. Rec. 2, 21, 524, 525; Cobb, The Rise of Religious Liberty in America, p. 242; Coons, The Achievement of Religious Liberty in Connecticut, p. 3 (Conn. Tercentenary Commn., Com. on Hist. Pub., Pamph. No. 60). While the church and state were bound closely together, the privilege of a freeman was never conditioned upon church membership. Cobb, op. cit., p. 245. Ecclesiastical societies, however, were organized by the general court, that is, the legislative body; churches were erected at public expense; the minister was called by a town meeting; and the regular support of the church was raised by a tax on all. Id., 246; Greene, The Development of Religious Liberty in Connecticut, p. 58.

In 1669, the general court gave to dissenters from the approved Congregational churches "allowance of their perswasion and profession in church wayes or assemblies without disturbance"; 2 Col. Rec. 109; but they were still taxed to support the approved churches. Coons, op. cit., p. 11; Cobb, op. cit., pp. 255, 264. Connecticut witnessed no such persecutions as occurred in other colonies. As tolerance gradually increased, further concessions were made to dissenters; these had the effect of enabling dissenters to pay for the support of the churches of their choice rather than the approved churches. Acts & Laws, 1769, pp. 169-171 (acts of May 11, 1727; May 8, 1729; Oct. 9, 1729); Statutes, 1784, pp. 21, 22; Cobb, op. cit., p. 501; Coons, op. cit., p. 22. Down to the time of the adoption of article seventh of the constitution of 1818, however, there was still a very large measure of authority in the general court over church affairs, with power to compel support of the church and attendance at services. The purpose of article

seventh, and it finds its counterpart in the federal constitution and other state constitutions, was, in the words of Jefferson, to erect "a wall of separation between Church and State." 16 Writings of Thomas Jefferson 282; see *Everson* v. *Board of Education,* 330 U.S. 1, 16, 67 S. Ct. 504, 91 L. Ed. 711; *Reynolds* v. *United States,* 98 U.S. 145, 164, 25 L. Ed. 244; *Jewett* v. *Thames Bank,* 16 Conn. 511, 516; *Second Ecclesiastical Society* v. *First Ecclesiastical Society,* 23 Conn. 255, 274; Cobb, op. cit., pp. 248, 270, 501, 512, 513.

Let us turn now to the history of tax exemption in this state, because it throws light upon the meaning and intent of article seventh. Lands granted for the ministry of the gospel were exempted as early as 1684. 3 Col. Rec. 158; Statutes, 1702, p. 64. The exemption of church property continued during the following century and was in effect when the constitution was adopted by a convention in September, 1818, and ratified by the people in October, 1818. Statutes, 1784, p. 111; id., 1796, p. 252; id., 1808, p. 433. At the session of the General Assembly the following May, another law was passed exempting church property from taxation. Public Acts 1819, c. 2, § 14. The Revision of 1821 listed property which was subject to taxation; it did not specifically list church property nor specifically exempt it. Statutes, 1821, p. 444. It did, however, exempt ministers of the gospel from the poll tax, and their houses, lands or other taxable property to the amount of $2500 from the property tax. Statutes, 1821, pp. 448, 449. In 1822, the General Assembly repaired the omission in the Revision of 1821 and specifically exempted buildings occupied as "colleges, academies, school houses, churches or infirmaries." Public Acts 1822, c. 29. This provision appears in the compilation of

1835. Statutes, 1835, p. 528; see *Masonic Building Assn.* v. *Stamford,* 119 Conn. 53, 57, 174 A. 301; *Yale University* v. *New Haven,* 71 Conn. 316, 333, 42 A. 87. Exemption of church property has been continued by the legislature in every compilation or revision of the general statutes since then to the present time. Statutes, 1838, p. 602; id., 1849, p. 603, § 11; id., 1854, p. 838, § 6; Rev. 1866, p. 707, § 6; Rev. 1875, p. 154, § 12; Rev. 1888, § 3820; Rev. 1902, § 2315; Rev. 1918, § 1160; Rev. 1930, § 1163; Rev. 1949, § 1761; Rev. 1958, § 12-81. A practical construction placed upon a constitutional provision immediately after its adoption and consistently and repeatedly followed by the legislature for over a century thereafter is most persuasive. *Cahill* v. *Leopold,* 141 Conn. 1, 14, 103 A.2d 818; *Water Commissioners* v. *Curtis,* 87 Conn. 506, 511, 89 A. 189. The continued legislative exemption of church property from taxation is strong evidence of the meaning of the constitutional prohibition against compulsory support of a church.

Exemption from taxation is the equivalent of an appropriation of public funds, because the burden of the tax is lifted from the back of the potential taxpayer who is exempted and shifted to the backs of others. *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702. The owners of tax-exempt property in the community derive the same benefits from government as other property owners but pay no property taxes for those benefits. This is true whether the relief from taxation be considered an exemption, as the legislature has described it, or results from a policy of considering church property not ratable for tax purposes. We conclude that the word "support" in article seventh was never intended to be employed in so narrow a sense as to prevent every sort of in-

cidental public assistance to, and encouragement of, religious activity.

With this background, we consider whether the use of tax-derived public funds to provide transportation for children to a school maintained by a church constitutes support of that church. To place the problem in proper focus, it is well to take note of the historic position of the state toward education. Our system of public schools had an early origin. Statutes, 1672, p. 62; 2 Col. Rec. 176. The purpose of the early as well as the later legislation was to provide at public expense schools for all, and particularly for those who could not otherwise obtain schooling. See General Statutes § 10-15. Education in this state was made compulsory long ago. Statutes, 1672, p. 13; General Statutes § 10-184. Parents or those who have charge of a child of school age are under a duty, enforceable by law, to send that child to public school unless he "is elsewhere receiving equivalent instruction . . . in the studies taught in the public schools." General Statutes § 10-184; see Public Acts 1842, c. 28; Public Acts 1872, c. 77, §§ 1, 2. The state can compel school attendance, but it cannot compel public school attendance for those who choose to seek, and can find, the equivalent elsewhere. *Pierce* v. *Society of Sisters,* 268 U.S. 510, 534, 45 S. Ct. 571, 69 L. Ed. 1070; *Judd* v. *Board of Education,* 278 N.Y. 200, 211, 15 N.E.2d 576.

The constitutionality of legislation authorizing transportation, at public expense, for children attending parochial schools has been upheld in states where the constitutional provisions invoked in opposition are couched in language stronger and more precise than that contained in article seventh. *Bowker* v. *Baker,* 73 Cal. App. 2d 653, 658, 167 P.2d 256;

*Nichols* v. *Henry,* 301 Ky. 434, 438, 191 S.W.2d 930; *Board of Education* v. *Wheat,* 174 Md. 314, 323, 199 A. 628; *Adams* v. *County Commissioners,* 180 Md. 550, 556, 26 A.2d 377; see *Chance* v. *Mississippi Textbook Rating & Purchasing Board,* 190 Miss. 453, 468, 200 So. 706; *Cochran* v. *Louisiana Board of Education,* 281 U.S. 370, 375, 50 S. Ct. 335, 74 L. Ed. 913. The reasoning in these cases is substantially that advanced in *Everson* v. *Board of Education,* 330 U.S. 1, 67 S. Ct. 504, 91 L. Ed. 711, that is, that public transportation to private schools aids the parents, who are under the compulsion of law to send their children to school; that it is a measure to promote the safety of the children; and that therefore it helps the parents and the children and not the school. A passage in *Chance* v. *Mississippi Textbook Rating & Purchasing Board,* supra, 467, which concerns free schoolbooks for pupils in all elementary schools, states the argument in this fashion: "The religion to which children of school age adhere is not subject to control by the state; but the children themselves are subject to its control. If the pupil may fulfil its duty to the state by attending a parochial school it is difficult to see why the state may not fulfil its duty to the pupil by encouraging it 'by all suitable means.' The state is under duty to ignore the child's creed, but not its need. It cannot control what one child may think, but it can and must do all it can to teach the child how to think. The state which allows the pupil to subscribe to any religious creed should not, because of his exercise of this right, proscribe him from benefits common to all." The plaintiffs have cited cases from other states which hold that legislation providing for the transportation of children to parochial schools at public expense is unconstitutional; most of them are dis-

tinguishable on the peculiar language of the constitutional provision concerned or on their facts.

Section 10-281 gives a broad discretion to the town. It accords to the people of the town the power to decide whether to furnish transportation for pupils attending nonprofit private schools and to the board of education the duty of implementing any decision to provide such transportation. The people of the town can revoke their decision if they find the burden too great or the operation improperly handled. The statute is a legislative exercise of the police power of the state. Police power generally means the power to govern and belongs to every sovereignty. *Allyn's Appeal,* 81 Conn. 534, 538, 71 A. 794; *State* v. *Coleman,* 96 Conn. 190, 192, 113 A. 385; see *State* v. *Gordon,* 143 Conn. 698, 702, 125 A.2d 477; 2 Cooley, Constitutional Limitations (8th Ed.) p. 1223. It can be lawfully exercised only in the public interest. Constitutions do not describe it. They circumscribe it so that it cannot be used in contravention of private rights guaranteed by the constitution. Collisions between the exercise of the police power and constitutional limitations or prohibitions are frequent. They occur when government in the furtherance of a claimed public purpose meets the individual citizen asserting an alleged constitutional right. And so in this case, the legislature, thinking to serve the welfare of parents and school children as well as that of the public, made provision for transportation to school at public expense. Private citizens claim, as they have the right to do, a violation of article seventh of the state constitution, proscribing any law to compel a person "to join or support" any church or religious association.

"The limit of the exercise of the police power is necessarily flexible, because it has to be considered

in the light of the times and the prevailing conditions." *State* v. *Gordon,* supra, 703; *State* v. *Hillman,* 110 Conn. 92, 105, 147 A. 294. When a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear. *Edwards* v. *Hartford,* 145 Conn. 141, 145, 139 A.2d 599; *Schwartz* v. *Kelly,* 140 Conn. 176, 179, 99 A.2d 89; *State* v. *Muolo,* 119 Conn. 323, 325, 176 A. 401; 1 Cooley, op. cit., p. 371; 11 Am. Jur. 776, § 128. "It is not enough that a statute goes to the verge of constitutional power. We must be able to see clearly that it goes beyond that power. In case of real doubt a law must be sustained." *Holmes, J.,* in *Interstate Consolidated Street Ry. Co.* v. *Massachusetts,* 207 U.S. 79, 88, 28 S. Ct. 26, 52 L. Ed. 111.

Article seventh, like the establishment of religion clause in the first amendment to the federal constitution, inter alia means that "[n]either a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa." *Everson* v. *Board of Education,* 330 U.S. 1, 15, 67 S. Ct. 504, 91 L. Ed. 711; *Illinois ex*

*rel. McCollum* v. *Board of Education,* 333 U.S. 203, 210, 68 S. Ct. 461, 92 L. Ed. 649; see General Statutes § 10-34. The statute challenged in the case at bar does none of these things. It aids the parents in sending their children to a school of their choice, as is their right. It protects the children from the dangers of modern traffic and reduces the hazard of contracting illness in bad weather. It is consistent with the present-day policy of gathering children into modern schools for better educational opportunities. It primarily serves the public health, safety and welfare and fosters education. In the light of our history and policy, it cannot be said to compel support of any church. It therefore does not come within the proscription of article seventh. It comes up to, but does not breach, the "wall of separation" between church and state.

The plaintiffs claim, also, that § 10-281 violates § 2 of article eighth of the Connecticut constitution.[3] This article provides that the "school fund" shall remain a perpetual fund and that the interest from it shall be "inviolably appropriated to the support and encouragement of the public, or common schools throughout the state, and for the equal benefit of all the people thereof." The fund, originally $1,200,000, derived from the sale of lands in the western reserve claimed by Connecticut. Statutes,

---

[3] "[Conn. Const. Art. VIII] Sec. 2. The fund, called the SCHOOL FUND, shall remain a perpetual fund, the interest of which shall be inviolably appropriated to the support and encouragement of the public, or common schools throughout the state, and for the equal benefit of all the people thereof. The value and amount of said fund shall, as soon as practicable, be ascertained in such manner as the general assembly may prescribe, published, and recorded in the comptroller's office; and no law shall ever be made, authorizing said fund to be diverted to any other use than the encouragement and support of public, or common schools, among the several school societies, as justice and equity shall require."

1821, p. 397 n. A statute enacted in 1795 imposed limitations on the use of the interest from the fund. Acts & Laws, 1795 (May Sess.); Statutes, 1796, p. 31; id., 1808, p. 43. The language of article eighth, § 2, of the 1818 constitution is sufficiently similar to that contained in the statute to show that the framers of the constitution were familiar with the statute.

In 1836, a surplus in the federal treasury was apportioned to the states. 5 Stat. 55, § 13. Connecticut's share, $763,661.38, was parceled out by the General Assembly to the towns in the state on condition that at least one-half of the interest from it be appropriated "for the promotion of education in the common schools." Public Acts 1836, c. 71, § 4; Statutes, 1838, p. 472, § 4; id., 1854, p. 688, § 9; Conn. Bd. of Educ. Rep., pp. 134, 136 (1888). In 1855, a change was made whereby all the interest from this fund, known as the town deposit fund, was to be appropriated for the support of common schools. Public Acts 1855, c. 84, p. 105; see Rev. 1866, p. 347, § 117; Public Acts 1872, c. 77, § 108; Rev. 1875, p. 89, § 3; General Statutes § 7-353.

The moneys from the school fund and the town deposit fund can be used only for common or public schools because of, as to the school fund, article eighth, § 2, of the constitution and, as to the town deposit fund, the legislative mandate. General Statutes §§ 7-350, 7-353, 10-257. By specific legislative direction, the town deposit fund must be kept and accounted for as a separate fund. General Statutes, c. 107. It has nothing to do with the school fund and is not governed by article eighth, § 2, of the constitution. So far as § 10-281 purports to make available, for the transportation of pupils attending nonprofit private schools, the moneys derived from the school fund, the statute is unconstitutional. As to

the moneys derived from the town deposit fund, the statute is inoperative by virtue of other legislation.

We were asked whether § 10-281 was unconstitutional for any of the reasons set forth in the complaint. To the question propounded, we answer "No, except as to moneys derived from the school fund; as to these, Yes, because of the provisions of article eighth, § 2, of the state constitution."

No costs will be taxed in this court in favor of any party.

In this opinion KING, MURPHY and SHEA, Js., concurred.

MELLITZ, J. (dissenting in part). I concur in the portion of the opinion which discusses the school fund and answers the question propounded "Yes." I disagree to the extent that the opinion answers the question "No," and with the reasoning which leads to that conclusion.

The single issue involved in this aspect of the case is whether Newtown, in paying from public funds other than the school fund for transportation for children attending St. Rose's School, is acting in contravention of article seventh, § 1, of the constitution of this state. The pertinent portion of the constitutional provision is that "no person shall by law be compelled to join or support, nor be classed with, or associated to, any congregation, church or religious association." The issue is one solely of interpretation of this specific constitutional provision. The majority opinion recites the stipulated facts. St. Rose's School is under the control and supervision of the ministry of the Roman Catholic Church. The school opened on September 3, 1958, with 217 pupils, all from Newtown. All of these pupils were transported to and

from the school in busses operated at town expense.

The question of the constitutionality of the statute resolves itself to this: Does the payment by the town for the transportation of pupils to or from St. Rose's School constitute support of the school within the proscription of article seventh, § 1? The following from *Judd* v. *Board of Education,* 278 N.Y. 200, 211, 212, 15 N.E.2d 576, is typical of the statements found in cases which have had occasion to discuss the subject: "The argument is advanced that furnishing transportation to the pupils of private or parochial schools is not in aid or support of the schools within the spirit or meaning of our organic law but, rather, is in aid of their pupils. That argument is utterly without substance. . . . Free transportation of pupils induces attendance at the school. The purpose of the transportation is to promote the interests of the private school or religious or sectarian institution that controls and directs it. 'It helps build up, strengthen and make successful the schools as organizations' *(State ex rel. Traub* v. *Brown,* 36 Del. 181, 187 . . .). Without pupils there could be no school. It is illogical to say that the furnishing of transportation is not an aid to the institution while the employment of teachers and furnishing of books, accommodations and other facilities are such an aid. . . . If the cardinal rule that written constitutions are to receive uniform and unvarying interpretation and practical construction is to be followed, . . . it cannot successfully be maintained that the furnishing of transportation to the private or parochial school out of public money is not in aid or support of the school."

The position of the majority is that the transportation is in furtherance of the state's compulsory education policy and that § 10-281 represents

the legislative concern for the welfare and safety of children who must use the highways in attending school in accordance with the requirements of the law. The view is that since the expenditure serves to further the public welfare, it is a form of support which does not offend the proscription of the constitutional provision. The majority opinion does not question that where transportation is required to enable a child to attend school, it is an integral part of the operation of the school, and that payment of the expense of transportation is an expenditure in support of the school. The opinion professes to draw a distinction between a form of support which is proscribed and a form which is constitutionally permissible. In my view all compulsory support is proscribed, and the only questions to be resolved are whether the expenditure involved constitutes "support" and, if it does, whether the beneficiary of the support is a "congregation, church or religious association" within the meaning of article seventh, § 1, of the constitution. Here, the existence of both elements is established.

The opinion refers to a number of decisions in state courts where the constitutional validity of legislation such as that which is under consideration has been sustained. In most of the state courts where the question has been presented, the legislation has been held to violate state constitutional restrictions. *State ex rel. Traub* v. *Brown,* 36 Del. 181, 187, 172 A. 835; *Judd* v. *Board of Education,* 278 N.Y. 200, 211, 15 N.E.2d 576; *Mitchell* v. *Consolidated School District,* 17 Wash. 2d 61, 65, 135 P.2d 79; *Gurney* v. *Ferguson,* 190 Okla. 254, 255, 122 P.2d 1002, cert. denied, 317 U.S. 588, 63 S. Ct. 34, 87 L. Ed. 481, rehearing denied, 317 U.S. 707, 63 S. Ct. 153, 87 L. Ed. 564; *Visser* v. *Nooksack Valley School*

*District,* 33 Wash. 2d 699, 708, 207 P.2d 198; *McVey* v. *Hawkins,* 364 Mo. 44, 55, 258 S.W.2d 927. The New York ruling was followed in 1938 by an amendment to the state constitution empowering the legislature to provide for the transportation of children to and from any school. N.Y. Const. Art. XI § 4. In New Jersey, a constitution was adopted in 1947 containing a similar provision. N.J. Const. Art. VIII § 4 (3).

The question we have is purely one of interpretation of a provision written into our constitution and of upholding it as it is written. The law leaves to every man the right to entertain such religious views as appeal to his individual conscience and to provide for the religious instruction and training of his own children to the extent and in the manner he deems essential or desirable. When he chooses to seek for them educational facilities which combine secular and religious instruction, he is faced with the necessity of assuming the financial burden which that choice entails. The observation of Justice Rutledge in his dissent in *Everson* v. *Board of Education,* 330 U.S. 1, 58, 67 S. Ct. 504, 91 L. Ed. 711, is apposite in this connection: "No one conscious of religious values can be unsympathetic toward the burden which our constitutional separation puts on parents who desire religious instruction mixed with secular for their children. They pay taxes for others' children's education, at the same time the added cost of instruction for their own. Nor can one happily see benefits denied to children which others receive, because in conscience they or their parents for them desire a different kind of training others do not demand."

The discussion in the majority opinion of the exemption of the property of religious organizations

from taxation is, in my view, not relevant to the question before us. In recognition of the importance of religion to the public welfare, it has been the firmly settled policy of the state since colonial days to leave such property, as property sequestered to public uses, untaxed. We have consistently recognized that the statutes do not grant an exemption in the technical sense but merely state a rule of nontaxability. *Arnold College* v. *Milford,* 144 Conn. 206, 210, 128 A.2d 537; *Brunswick School* v. *Greenwich,* 88 Conn. 241, 243, 245, 90 A. 801; *St. Bridget Convent Corporation* v. *Milford,* 87 Conn. 474, 478, 88 A. 881. This policy has been in pursuance of the "principle that property necessary for the operation of State and municipal governments, and buildings occupied for those essential supports of government, public education and public worship, ought not to be the subject of taxation, [a principle which] has been with us accepted as axiomatic." *Yale University* v. *New Haven,* 71 Conn. 316, 332, 42 A. 87. The exemption takes nothing from the funds which have been raised by taxation and is not the same thing as compelling contribution to churches to the extent of the exemption. Cobb, The Rise of Religious Liberty in America, p. 523. As was said in *Trustees of Griswold College* v. *State,* 46 Iowa 275, 282, a constitutional prohibition against the levying of taxes or other rates for church purposes does not embrace a prohibition against exempting church property from taxation. See 2 Cooley, Constitutional Limitations (8th Ed.) p. 1089, n.2.

It is my view that the answer to the question propounded in the stipulation for reservation should be "Yes."