CATHOLIC UNIVERSITY OF PUERTO RICO, Plaintiff and Appellee, *v.* SECRETARY OF THE TREASURY, Defendant and Appellant.

No. R-64-236.        Decided May 6, 1966.

J. B. *Fernández Badillo, Solicitor General*, and *Elpidio Arcaya, Assistant Solicitor General*, for appellant. *José Guillermo Vivas, Jorge Lucas P. Valdivieso, Jr.*, and *Carlos Martínez Texidor* for appellee.

Second Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Santana Becerra, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The Catholic University of Puerto Rico, a nonprofit educational corporation organized under the laws of the State of New York, is the owner of radio station "W.E.U.C." The station is operated through a subsidiary, "The Catholic University of Puerto Rico Service Association", which is a non-

profit association organized under the laws of Puerto Rico. The radio station is located on the campus of the University.

For the year 1960–61 the Secretary of the Treasury assessed taxes amounting to $290.17 on the property of the radio station. The taxpayer paid the taxes during the first semester and subsequently requested reimbursement of the tax on the grounds that the property was tax exempt. The Secretary of the Treasury denied the request and the taxpayer filed this appeal.

The taxpayer contends in its petition that the station is essentially, mainly and predominantly used for the broadcasting of cultural programs to aid the education of the students attending the University as well as the community in general. That the programs aired are composed of classical and selected music as well as of a literary, scientific, religious and cultural nature. The Secretary of the Treasury denied the above facts and contends that "even though the broadcasting of cultural programs is a predominant purpose of W.E.U.C., it is also true that the broadcasting of paid commercial programs is another essential purpose of the station."

The taxpayer also contends that incidental to the broadcasting of the programs, and for the sole purpose of defraying expenses, the station requested financial cooperation from a limited number of persons and in exchange broadcasts their names as sponsors of certain programs without any pecuniary profit to the taxpayer. These facts were denied by the Secretary of the Treasury. The issues having been thus drawn, the taxpayer did not offer any parol evidence. The litigated question was submitted on the basis of documentary evidence which consisted of three brochures of the Catholic University for the years 1960 through 1962; a financial statement of the station for the fiscal year 1960–61, and a letter written by the Chancellor of the Catholic University, Mr. McMannus, to the Secretary of the Treasury on Decem-

ber 11, 1959, and which was offered as evidence by both parties. In this letter the Chancellor reported to the Secretary of the Treasury that in the month of May 1958, the school began to operate radio station W.E.U.C., located on the campus of the University, as an activity thereof and as a cultural and educational service to the students and the community. In beginning this activity the school asked for and obtained a commercial license from the F.C.C. The reason for this was evident, the Chancellor stated, since the costs of operating a radio station for 15 hours a day were heavy. At that time, due to efforts to keep the costs of education as low as possible for the students, the income of the University was not sufficient to permit the operation of the station on a noncommercial basis. Therefore, in order to be able to offer this educational and cultural service to the community, the school was forced to solicit paid advertising. In the financial statement offered as evidence it is shown that for the year ended June 30, 1961, the year of the tax assessment, the station had income of $17,266.94 and expenses of $15,102.03, resulting in a $2,164.91 excess of income over expenses.

Based on this evidence the deciding court admitted the complaint. It was the opinion of the court that in order to determine the right to the exemption, the main and predominant use of the station and not its incidental use should be considered; W.E.U.C. was used predominantly to encourage and enhance the education of Catholic University students and the community in general; and in this case neither the Catholic University nor the station operate as commercial enterprises.[1]

---

[1] The letter of the Chancellor, Mr. McMannus, reads:

"In May of 1958, we put into operation as an *activity of the University and as a cultural and educational service to the students and the community*, the radio station WEUC, *located on the grounds of the Catholic University*.

"In beginning this service and activity, we asked for and obtained a commercial license from the FCC. Our reason for doing this is evident.

Section 291 of the Political Code, as applied to this case, provides that the following property shall be exempt from assessment for taxation purposes:

"(e) Every building, including the equipment and furniture therein, used and set apart exclusively for religious worship, as well as for parish houses used exclusively as dwelling of priests, ministers, or clergymen and where they constantly live; every building including the equipment and furniture therein, set apart for a Masonic or 'Odd-Fellows' lodge or for a center for theosophical or psychological studies, or used as a center for literary, or scientific education, or as charity center; every building, including the equipment and furniture therein, which is used and set apart exclusively for labor organizations or as a place for recreation, culture, and social intercourse, and which permanently maintains a reading room where periodicals, magazines, pamphlets and illustrated papers in general, national as well as foreign, are provided; and every tract of land, not exceeding five cuerdas in extent, upon which such building or buildings is or are constructed, provided such grounds and buildings be the absolute property of the organization or institution applying for the exemption, and are not totally or partially leased or used with a view to pecuniary profit either for the lessor or for the lessee, and provided the said institution is not for pecuniary profit; Provided, that in the cases of institutions devoted to teaching, the limitation of five (5) cuerdas, hereinbefore set forth, shall not apply, and the tax exemption on the land shall be extended up to a maximum of one hundred (100) cuerdas, provided that the said lands are used in regard to teaching."

According to the evidence in the record, this case deals with property offering, through radio programs, a cultural and educational "service" to the students of the university

---

The costs of operating a radio station for 15 hours daily are heavy. At the same time, and due to our efforts to keep the costs of education as low as possible for our students, the income of the University is not sufficient to permit the operation of the Radio Station on a non-commercial basis. Therefore, in order to be able to offer this educational and cultural service to the Community, we have been forced to seek for paid advertising." (Italics ours.)

and to the community. This evidence does not show whether the University, through the station, properly carried out part of its teaching function. Admitting that W.E.U.C. is used as a "literary, educational and scientific center" the property is tax exempt if: (1) it is owned by a nonprofit organization; and (2) it is not totally or partially leased or used with a view toward pecuniary profit.

According to the aforementioned provisions of the applicable law, the right to the exemption claimed by the taxpayer is not decided solely on the basis of the main or predominant use or the incidental use of the property for the cultural purpose desired. This criteria of the main or incidental use has developed, in law, as the result of the interpretation and application of those provisions of law requiring an exclusive use of the property for the determined purpose. Cf. *Buscaglia, Treas.* v. *Tax Court,* 66 P.R.R. 623, 630–1 (1946); *Club Yaucano* v. *Sec. of Treas.,* 83 P.R.R. 601, 607–8 (1961), and cases cited therein. Cf. *University Club* v. *Lanier,* 161 So. 78 (Fla.); *Cardinal Pub. Co.* v. *City of Madison,* 237 N.W. 265 (Wis.). Cf. *State* v. *Bridges,* 21 So.2d 316 (Ala.); *Smith* v. *Feather,* 229 S.W.2d 417.

■ It may be pointed out, as a question of fact, that § 291 (e), in opposition to its provisions in connection with the use of other properties mentioned, refers to a building and the furniture therein "used as a center for literary or scientific education." If this was the only legal requirement for taking the tax exemption, the main or predominant use or the incidental use of the property would be a pertinent fact, even though we would not have on record the necessary elements of evidence for the valuation of such fact. However, it is an essential requirement apart from the fact of its ownership by a nonprofit organization such as the University, that the property is neither *totally nor partially* used or

leased with a view to pecuniary profit, either by the lessor or by the lessee.

██ Apparently, it looks like a contradiction, that it being required that the property be wholly owned by a nonprofit organization, said organization is precluded, at the same time, in order to receive the exemption, from using the property either totally or partially for a pecuniary profit. This is explained because, historically, our statute has granted the exemption to the property per se, based on the use thereof. Our jurisdiction, in opposition to many others, has not granted the exemption to the organizational owner of the property because of a nonprofit character or the purposes pursued by its activities, regardless of the use given to the property.

When § 291(e) was originally adopted in 1902 it granted a tax exemption to buildings and furniture therein used exclusively for religious worship, and to buildings and the furniture therein used as a center for literary or scientific education or as a charity center. The ownership of the property by a nonprofit organization was not required, but it has been determined since then that the property should not be leased or "in any other way" used with a view to pecuniary profit, either by the lessor or by the lessee. Since the very beginning the property and its use, not the owner, was considered. When, by Act No. 42 of July 7, 1925, other properties were included within the exemption, it was provided for the first time that the properties should be owned by a nonprofit organization. However, the Legislature did not change the original prohibition. In *School of Commerce* v. *Tax Court*, 77 P.R.R. 830 (1955), we interpreted § 291(e) before its amendment by Act No. 266 of May 10, 1950, in the sense that property used as an educational center should be owned by a nonprofit organization even though the statute did not expressly so require. In 1950 the Legislature by Act No. 266 expressly required this and made the prohibition more re-

strictive by providing that the property should not be leased or used *"totally or partially"* with a view to pecuniary profit.

The legislative intention in the sense that the tax-exempt property not be used for pecuniary profit even though the profit is to be used by a nonprofit organization is clear upon this historical view. The Legislature must have been aware, as we are, of this situation when enacting the law. Probably they did not believe it to be a good policy that the tax exempt property be placed in the commercial field in competition with taxable property. There is no need to repeat ourselves since we have said it many times and it is a well settled principle that this statute must be restrictively construed without going beyond the intent of the Legislature in the recognition of the exemption, or in constructively altering requirements clearly imposed. As stated in *Snyder* v. *Town of Newtown,* 161 A.2d 770 (Conn.), exemption from taxation is the equivalent of an appropriation of public funds, because the burden of the tax is lifted from the back of the potential taxpayer who is exempted and shifted to the backs of others.

In *Chamber of Commerce* v. *Tax Court,* 67 P.R.R. 400, 403 (1947), we stated: "Not only are we of the opinion that the building of the Chamber of Commerce is not used and destined exclusively and wholly for the purposes mentioned in the statute but we also think that in renting the lower story of the building in the manner already stated the lessor is obtaining a pecuniary profit therefrom." The lessor, the Chamber of Commerce, was a nonprofit organization. And further: "The fact that the total proceeds of the rent are being used by the petitioner for the purpose of amortizing the debt which burdens the building does not alter the situation in any way." *Cf. Columbus Youth League* v. *County Board of Revision,* 174 N.E.2d 110 (Ohio), and authorities therein mentioned holding, in effect, that in legal situations such as the one provided for by our statute, the use set

forth for any profits derived from the use of the property is not a deciding factor in allowing the exemption.

■ The letter of the Chancellor clearly states that, although the purpose of the station was the broadcasting of cultural programs, it has been provided from the very beginning, and evidently for financial reasons, that the station be used in a commercial manner. The necessary license was obtained and, in return for payment, commercial publicity was given. Undoubtedly the property was partially used for the intended purpose of obtaining a pecuniary profit for its owner for compelling economic reasons.

The *Club Yaucano* on case which the trial court relied heavily in sustaining the tax exemption differs in its facts from the case at issue. In discussing the question litigated in that case we stated (83 P.R.R. 608): "The respondent court concluded that appellant could not claim exemption for its building because, although it was organized as a nonprofit association, *'the manner in which it was set up and its operation established* permits and gives occasion to use for personal benefit (of some of its members) the property for which exemption is claimed.' In order to arrive at this conclusion, it made a perusal of the by-laws and incorporation clauses of the Club Yaucano, particularly those bearing on a possible liquidation of the association . . . ." "However, we do not believe that for the purpose of passing upon the right to exemption it is necessary *to project the facts into the future and derive the possible consequences of a liquidation,* but that it is necessary to consider whether the situation at the time the tax was assessed supports the fact that the building was used for the exclusive purposes of the association, and whether the use inures *to the economic benefit of the association* or of any of its members in particular. [citation] The evidence, in our opinion, requires that both propositions be answered *in the negative.* The testimonies

of Julio C. Torres and Francisco Lluch established that the building has not been leased nor used by private persons, and 'except for the use of its members'; that the halls and recreation facilities are not ceded to persons other than members; and that membership is indispensable for the use of the building . . . ." Furthermore, on page 610 we stated that as understood by the Secretary of the Treasury "the controversy was actually confined to determining whether the halls and facilities of the building of Club Yaucano *were ceded to private persons, for pay;* and, as has been seen, the only evidence offered does not support the contention of the Secretary of the Treasury." (Italics ours.) The *Club Yaucano* case was decided according to the stated facts. The decision now reached according to the facts in this case is not in conflict with the above decision. *Trinidad* v. *Sagrada Orden,* 263 U.S. 578, mentioned by the deciding Court, and similar cases cited by the appellant, are not applicable to this case. In *Sagrada Orden* the statute exempted from taxation the *net income* of a corporation which was organized and operated exclusively for religious purposes, no part of whose net income inured to the benefit of any private stockholder or individual. After admitting that Sagrada Orden operated for religious, charitable and educational purposes, the decision granting the tax exemption was contested on the grounds that Sagrada Orden also operated for commercial purposes because it used its property to produce income and it traded in wines, chocolate and other articles. The Supreme Court, in sustaining the decision, stated that the applicable provision recognized that a corporation may be organized and operated exclusively for religious, charitable and educational purposes and yet have a *net* income, and that the statute said nothing about the source of the income, but made the destination the ultimate fact of the exemption. Stated differently, the Supreme Court held that the organization could devote and use its properties for the production of net income and still be organized for

exclusively religious purposes. It is a generally known fact that there are religious, charitable, and educational organizations accumulating income derived from the use and disposition of their properties without altering their organizational character. Furthermore, and even though it was not considered a pertinent factor the Court pointed out that the trading in wines, chocolate and other articles by the Orden did not amount to engaging in trade in any normal sense of the term. It was not claimed, as observed, that there was any selling or competition with others. The articles were bought and supplied for use within the plaintiff's own organization and agencies, some of them for strictly religious uses. The fact that the transactions yielded some profit was, under the circumstances, a negligible factor.

The *Sagrada Orden* and other similar cases such as *Debs Memorial Radio Fund* v. *Commissioner of Internal Revenue*, 148 F.2d 948 (2d Cir.) ; and *Commissioner of Internal Revenue* v. *Battle Creek*, 126 F.2d 405 (5th Cir.), are typical of those situations where the exemption is granted to the organization per se as a result of its nonprofit character and the activity engaged in and where there is no legal reason for prohibiting the organization from using or devoting its property toward the production of income, provided that this income does not inure to the benefit of private persons. So, in *Debs Memorial,* a corporation organized to present educational, civil and cultural programs, it was held that the fact that substantially all its income was derived from commercial broadcasts to which a portion of its time was devoted did not establish that the corporation was not a civic organization operating exclusively for social welfare under the provisions of the Federal Internal Revenue Code exempting nonprofit civil organizations from income tax. Similarly, our Income Tax Act exempts from taxation those corporations organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes no part of the

*net income* of which inures to any private stockholder or individual. (Section 101 of Act No. 91, of June 29, 1954, 13 L.P.R.A. § 3101.) Based on this provision, the taxpayer, who has been organized as a nonprofit organization, would be tax exempt. The applicable exemption when directed to the property with its limitations imposed on its use and not on its owner, requires a different judgment. This case also differs from those cases recognizing exemptions for dormitories, dining rooms, and cafeterias of a college or university operated for the exclusive benefit of its students (not open to public), since their operation is needed to carry on the educational purposes of the school. *Cf. Pace College* v. *Boyland,* 151 N.E.2d 900 (N.Y.), and authorities following in 72 A.L.R.2d 521.

■ Finally, we refer to an amendment to § 291(e) by Act No. 2 of March 11, 1963, invoked by the taxpayer. Apart from the fact that this amendment is not applicable to a tax assessment for the fiscal year 1960–61 since it is not of retroactive effect, the amendment does not revoke the ruling in the *Chamber of Commerce* case, *supra.* Rather, the amendment affirms the rules of law in that decision and the statutes the rules are based on. The Legislature, by this amendment, only authorized partial or prorated taxation, according to use, which the Court was not authorized to do in deciding that case. *Cf. State* v. *Bridges, supra,* and the discussion following at 159 A.L.R. 685. The amendment applies in the event "that part of the property is not occupied by the organization or institution for its nonprofit aims and purposes, or that part of the property *is leased and producing pecuniary profit,* either for the lessor or for the lessee." This part of the property shall be subject to taxation. Even if we were able to apply the 1963 amendment to the particular circumstances of this case, we still do not have the necessary authority, in lack of an administrative ruling or a law, to determine the taxable and nontaxable portion of the property,

since the same property and equipment are used for both commercial and noncommercial broadcasting.

The judgment rendered shall be reversed and a new decision denying the reimbursement of taxes shall be entered.